No. 46,859

Mary Ellen Kirkpatrick and Jayde Sprecker, d/b/a Kirkpatrick & Sprecker, A Partnership, *Appellees*, v. Seneca National Bank, A National Banking Association, *Appellant*.

(515 P. 2d 781)

Opinion filed November 3, 1973.

Terry G. Paup, of Sargent, Klenda and Paup, of Wichita, argued the cause, and Daniel R. Glickman, of the same firm was with him on the brief for the appellant.

Jack Scott McInteer, of Weigand, Curfman, Brainerd, Harris & Kaufman, of Wichita, argued the cause, and Windell G. Snow, of the same firm was with him on the brief for the appellees.

The opinion of the court was delivered by

Kaul, J.: Plaintiffs-appellees, a partnership doing business as certified public accountants, instituted this action against defendant-appellant, Seneca National Bank, to recover for services rendered in auditing the books of and preparing financial statements reflecting the financial condition of the Barkley Sheet Metal Co. Inc., a

customer and debtor of defendant. For convenience the parties mentioned will hereafter be referred to as Kirkpatrick or plaintiffs, Bank or defendant, and Barkley.

Mr. Lanny D. Jackson, vice-president and cashier of the bank, was in charge of the Barkley account. During the summer of 1970, the Bank became concerned about Barkley's loan account because a financial statement of Barkley made as of July 31, 1970, reflected that Barkley had operated at a substantial loss during the period April 1 through July 31, 1970. The statement was prepared by another certified public accountant firm identified as Peterson, Peterson and Goss. A previous statement prepared by Peterson reflected a net profit of $20,205.00 for Barkley for the corporate fiscal year ending March 31, 1970. The next statement prepared by Peterson running through July 31, 1970, reflected a loss of $65,505.55, during the interim period. The evidence discloses that at this point Bank was considering the termination of Barkley's line of credit, calling its notes and foreclosing on secured collateral which, in effect, would close down Barkley's operations.

Mr. Barkley, president of the Barkley company, expressed the opinion to Jackson that the accounting procedures of Peterson in preparing the previous financial statements were adversely erroneous. Miss Mary Ellen Kirkpatrick, a partner in plaintiffs' firm, was contacted by C. I. Blair, who was employed by Barkley as an estimator. Blair had known Miss Kirkpatrick for several years. Arrangements were made for a meeting in the Kirkpatrick office on November 11, 1970. Barkley, Blair, Jackson and Miss Kirkpatrick were present at this conference. The current financial condition of Barkley was discussed and the financial statements prepared by Peterson were reviewed. Miss Kirkpatrick testified that both Jackson and Barkley indicated to her that they had been unable to obtain from the Peterson firm a satisfactory explanation for the appearance of such a substantial loss during the four-month period ending July 31, 1970. Miss Kirkpatrick further stated that she questioned the accuracy of the previous Barkley financial statements and suggested that when corrected a much different picture of losses supposedly incurred by Barkley might be reflected.

In the course of the conference Jackson, Barkley and Miss Kirkpatrick discussed whether or not the additional expense in preparing a new financial statement for Barkley was justifiable as Barkley had not paid all of the accounting fees then owed to Peterson, the

former accountants. Jackson informed Miss Kirkpatrick the Bank had all of Barkley's accounts receivable under assignment and all of the proceeds for Barkley's "work-in-progress" were coming to the Bank; that he was authorizing the payment of bills by Barkley; and that as long as he was handling the Barkley account for the Bank, he would see that Kirkpatrick's accounting fees would be paid by Barkley. Miss Kirkpatrick testified that she would not have performed the work without the assurance of Jackson that her fees would be paid; and that she relied on that assurance and proceeded to prepare accounting statements for Barkley running through September 30, 1970.

On or about October 10, 1970, Jackson asked Miss Kirkpatrick to extend the financial statement current to October 31, 1970. Jackson testified that the Bank needed to know the current financial position of Barkley because the Bank at that time had advanced $138,700.00 to Barkley; that the Bank's position was over-extended and beyond their loan limitations, and an examination by bank examiners was expected. In compliance with the Bank's request Miss Kirkpatrick prepared supplemental statements running through October 31, 1970, these statements showed that the indebtedness of Barkley to the Bank had dropped by $11,000.00 during the month of October. In the meantime, in reauditing the earlier financial reports by Peterson, Miss Kirkpatrick discovered accounting errors which she believed entitled Barkley to income tax refunds. Thereafter, Kirkpatrick prepared and filed amended returns for Barkley claiming a refund in the amount of $4,787.00 on Federal income tax and $721 on Kansas State income tax. Bank obtained an assignment from Barkley of the tax refunds.

For services performed Kirkpatrick invoiced Barkley on October 30, 1970, in the amount of $3,157.50. After the final work was completed Kirkpatrick again invoiced Barkley on November 30, 1970, in the amount of $3,323.75. Miss Kirkpatrick testified that when she discussed the tax refunds with Jackson she told him the amount of the bill for plaintiffs' services and that he was aware of the original billings sent to Barkley.

On or about December 8, 1970, after Barkley mentioned the Kirkpatrick bill to him, Jackson directed Barkley to send Kirkpatrick a check in the amount of five hundred dollars. On February 27, 1971, Kirkpatrick sent a statement for services in the amount of $2,996.25 addressed to Barkley and the Bank "codebtors." On

March 12, 1971, Kirkpatrick received a letter from P. R. Mullen, president of defendant Bank, stating that the Bank disclaimed any liability for payment of the invoice. This litigation was then instituted.

In their petition plaintiffs allege that the Bank was indebted to them for accounting services performed for Bank, the reasonable value of which was $2,996.25 and prayed for judgment accordingly. Bank answered in the form of a general denial.

After a pretrial conference an order was entered which reflected stipulations of the parties and delineated their respective positions. Plaintiffs contended they were entitled to recover for breach of contract on several alternative theories; namely, breach of express contract, breach of contract implied in fact and breach of contract implied in law or quasi-contract. Plaintiffs elaborated on their alternative theory of recovery for breach of quasi-contract by asserting that it was based upon legal liability imposed upon the Bank to answer for the reasonable value of the accounting services for the purpose of imposing a legal obligation and affording a remedy, without which injustice would result.

The pretrial order reflects that Bank asserted as a defense that plaintiffs failed to state a claim upon which relief could be granted. In addition Bank attacked plaintiffs' theory of recovery for breach of contract by asserting that there was no contract (1) for lack of mutual assent; (2) for lack of sufficient definiteness as to terms; and (3) for lack of legally sufficient consideration. Bank further asserted that plaintiffs' theory relative to surety or guaranty was barred by the statute of frauds. As an affirmative defense Bank further asserted that plaintiffs, by their own actions, were estopped legally and equitably from asserting against it any claim for accounting.

In this posture the case came on for trial to the court. The evidence consisted primarily of the testimony of Mary Ellen Kirkpatrick, Blair and Jackson. There is no material conflict in their testimony concerning the chronology of events or what was said or done by the parties on the several occasions testified about.

In its decision, which was announced from the bench, the trial court ruled in substance; first, that there was no meeting of minds between Kirkpatrick and the Bank on a contract whereby the Bank obligated itself through its own funds to pay Kirkpatrick for the accounting services. The court commented:

". . . [T]he parties did not agree on a promise that the bank would indemnify or stand in the shoes of the sheet metal company and pay in the event they didn't pay. We have already decided that didn't happen. Such understanding was not made."

The court then proceeded to find the Bank obligated on the theory that Bank did promise to pay or direct payment from Barkley's funds in its control. The court announced its findings on this theory as follows:

"It must be found that the bank stood in the position of an agent of the sheet metal company under its contract assigned to it and under its understanding with the sheet metal company that it would disburse—I started to say all funds but at least the bulk of the funds from the contracts coming into the hands of the bank. Therefore, the bank was an agent for this purpose. And when the parties met the first time to request the services of the accounting firm, both principal and the agent were present; that is, the vice-president of the bank as the agent and the principal—I don't know—was Mr. Barkley present at the meeting?

"MR. SNOW: Yes, Mr. Blair, Mr. Barkley, Mr. Jackson . . .

"THE COURT: Well, both of the representatives of the principal. I think we will have to conclude the principal was likewise present. And this being true, instead of the bank promising to pay for the debt of another from its own funds, *the bank did promise to pay for the accounting services or to see they were paid from the sheet metal company's fund.* This was an obligation supported in law on the contract theory of principal and agent. *The bank had the authority to pay from the sheet metal company's fund and it had funds and ability to pay and it failed to do so.* Therefore, it can be held liable for the damages accruing to the accountants when a contingency happened by which the bank no longer had funds of Barkley with which to pay the accountants.

"So, I think on a theory of damages here the accountant can recover. Time was not of the essence but the bank did have the opportunity to pay within a reasonable time and didn't do so, and five months was too long to wait. But even after being made aware the accountants were holding the bank liable, it did not pay.

"So, I think we will have to say that the bank's failure to pay as it had promised to do, as the agent of Barkley, makes the bank liable.

"The evidence further showed that the bank by having brought about a partial payment of five hundred dollars through the sheet metal company could have brought about the payment of the entire sum. And its failure to have reasonably done so is what caused the damage to the accountants.

"Therefore, judgment is rendered in favor of the plaintiffs and against the defendant in the amount specified. . . ." (Emphasis supplied.)

In its first point on appeal Bank claims the trial court erred as a matter of law in finding that the defendant, as a disclosed agent of Barkley, became liable for payment of plaintiffs' accounting fees. Bank vigorously disagrees with the trial court's finding that it was

an agent of Barkley and, in the alternative, asserts that if agency did exist then Barkley was a disclosed principal which brings into application the rule that an agent for a disclosed principal cannot be liable on the principal's contract when the agent is acting within the scope of his authority, unless the agent expressly agrees to assume and understands that he is assuming his principal's obligation. We agree that nonliability of an agent for a disclosed principal, with certain exceptions, is a well-established principle of agency law; however, we do not believe the principle governs the disposition of the issue here. Labeling the relationship of Bank and Barkley as one of agency was only incidental to the substance of the trial court's findings which were: (1) Bank promised to pay for the accounting services or to see they were paid from Barkley's funds; (2) Bank was authorized to pay or direct payment from Barkley's funds; and (3) Bank had control of Barkley's funds and the authority to direct payment to Kirkpatrick and it failed to do so even though, according to Jackson's testimony, Barkley's notes to Bank were reduced approximately $11,000.00.

The trial court's findings are fully supported by the evidence. Jackson, whose authority to bind Bank is not questioned, testified on direct examination as follows:

"Q. Did you tell Mrs. Kirkpatrick or did you assure her she would be paid?
"A. Yes, I did.
"Q. Now, why did you tell her that?
"A. Because I was handling the financial affairs in one sense of the word: all the money coming from the contract was coming directly to the bank and I was working directly with Mr. Barkley in paying outstanding bills. . . ."

He further testified:

"Q. Did the bank have any control over whether or not Barkley Sheet Metal paid Kirkpatrick and Sprecker, Mr. Jackson?
"A. Yes, we had control over it. I was handling the funds.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. It is possible if given sufficient time from October 31st until March 11th, which was the date that the Barkley Sheet Metal filed their bankruptcy petition, that the Seneca National Bank could possibly have gotten Mr. Barkley to [have] paid at least the October 31st balance?
"A. Oh yes, it was entirely within my hands most of the time. I could have told him to pay it and he would have paid it.
"Q. There was sufficient revenue available for Mr. Barkley to have paid that debt?
"A. Yes."

Miss Kirkpatrick testified that she would not have performed the

work without Jackson's assurance that she would be paid. In her testimony she explained the reason for her position in this manner:

"A. The reason being it appeared on the basis of things that the situation was utterly hopeless to expect to be paid when they [Barkley] were in the financial position they were in: on the basis of that information and the fact that the indebtedness existed to a prior accounting firm."

She further testified that Jackson authorized and requested her to continue working so as to extend the financial statement through October 31, 1970, because, as Jackson told her, the Bank's loan position was above limits, and that a financial statement reflecting the most current financial position of Barkley was needed since loan commitments would be reviewed by bank examiners.

We think the evidence sufficient to support the trial court's finding that Bank through Jackson made an independent promise to Kirkpatrick that it would direct payment out of Barkley funds which were under its control and that in reliance thereon Kirkpatrick proceeded to perform the accounting services part of which, at least, was for the direct benefit of Bank and at its request. It is undisputed that Bank had full control over Barkley's funds, whether control was acquired by Bank as an agent of Barkley or by an agreement in connection with Barkley's assignment to Bank is immaterial as far as the rights of Kirkpatrick are concerned. Relying upon the promise of Bank, Kirkpatrick performed the services. Bank should have reasonably expected that its promise or assurance through Jackson induced Kirkpatrick to perform the accounting services. Failure to enforce the obligation under the circumstances related would result in injustice.

The foregoing evidence and the pertinent findings of the trial court bring this case well-within the rule set forth in Section 90, Restatement of the Law of Contracts:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." (p. 110.)

Although Restatement does not employ the term "promissory estoppel" it restates the principle of that doctrine in section 90. (1 Williston on Contracts, [3rd Ed. by Jaeger], § 140, pp. 607, 611.) In a discussion of section 90 in his work on contracts, Professor Corbin finds use of the term "promissory estoppel" objectionable because, as he says "The word estoppel is so widely and loosely

used as almost to defy definition." (1A Corbin on Contracts, § 204, pp. 232, 233.) Professor Corbin further notes, however, that in finding the term "promissory estoppel" objectionable he must not be misunderstood as disapproving the many decisions that make use of it; that they should practically always be approved as clearly falling within Restatement, Contracts, § 90. In a comment entitled "Once More into the Breach: Promissory Estoppel and Traditional Damage Doctrine" (Vol. 37 University of Chicago Law Review) the author notes the phrases "enforcement of a promise because of reliance," "action-in-reliance," and "promissory estoppel," are used synonymously with reference to the rule articulated in section 90.

The rule set forth in section 90 has long been recognized and relied upon by this court. (*Greiner v. Greiner,* 131 Kan. 760, 293 Pac. 759; and *Southwestern College v. Hawley,* 144 Kan. 652, 62 P. 2d 850.) More recently the rule was spoken of as "the reliance doctrine" and applied to a factual situation somewhat analogous to that of the instant case in *Farmers & Merchants State Bank v. Snodgrass & Sons Construction Co., Inc.,* 209 Kan. 119, 495 P. 2d 985. In our most recent consideration of section 90 in *Marker v. Preferred Fire Ins. Co.,* 211 Kan. 427, 506 P. 2d 1163, we noted that in the more recent cases the doctrine has been designated as "promissory estoppel." In *Marker* we noted the distinction between "equitable estoppel" and "promissory estoppel" and with respect to application of the latter we said:

". . . The cases hold that in order for the doctrine of promissory estoppel to be invoked the evidence must show that the promise was made under circumstances where the promisor intended and reasonably expected that the promise would be relied upon by the promisee and further that the promisee acted reasonably in relying upon the promise. Furthermore promissory estoppel should be applied only if a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice. . . ." (p. 434.)

In *Marker* application of the doctrine was rejected because there was no evidence whatsoever of any affirmative inducement and for the additional reason that the evidence fell far short of showing that Johnson (promisor) intended or expected Marker (promisee) to rely upon the promise or that Marker reasonably had the right to rely upon Johnson's promise.

In the instant case the evidence shows that Kirkpatrick reasonably had the right to and did rely upon Jackson's promise; and further than Bank should have reasonably expected such reliance on the part of Kirkpatrick. In his testimony, Jackson indicated that

he could not have reasonably expected Kirkpatrick to do the work without assurance of payment and that it was reasonable to assume she would not have performed without assurance that she would be paid. Bank knew the exact state of Barkley's financial condition subsequent to October 31, 1970; Kirkpatrick did not. Bank improved its position with its debtor Barkley by a substantial sum but failed to direct payment to Kirkpatrick even though funds were available.

We hold that the Bank, through Jackson, made a promise to Kirkpatrick upon which she could reasonably be expected to and did rely and thereby was induced to suffer detriment by performing the services in question; and that under the circumstances injustice to Kirkpatrick could be avoided only by the enforcement of Bank's promise.

While the trial court apparently misapplied the law of agency, nevertheless, its findings of fact support the judgment rendered. Bank's obligation to Kirkpatrick is based on its independent promise not on any particular relationship between Bank and Barkley. Control of Barkley funds by Bank was a necessary fact to be established by Kirkpatrick, but the evidence on this point indicates that Bank's control came about by assignment from Barkley, rather than from the establishment of an agency relationship. The trial court's finding that Bank made an independent promise to pay or direct the payment of Kirkpatrick out of Barkley funds, under its control, is not inconsistent with but serves as a basis for our holding on appeal. Nevertheless, we call attention to the oft repeated rule that the judgment of a trial court is to be upheld, if it is correct, even though the court may have relied upon a wrong ground or assigned an erroneous reason for its decision. (*Pierce v. Board of County Commissioners,* 200 Kan. 74, 434 P. 2d 858; *Leaderbrand v. Central State Bank of Wichita,* 202 Kan. 450, 450 P. 2d 1; and *Custom Built Homes Co. v. State Comm. of Rev. and Taxation,* 184 Kan. 31, 334 P. 2d 808.)

Bank argues that the trial court's finding that Bank agreed to pay from Barkley's funds is so inconsistent with and contradictory to its first finding of no agreement or meeting of the minds on the proposition that Bank, through its own funds, became obligated that the judgment cannot stand. Bank cites *Stamper v. Jones,* 188 Kan. 626, 364 P. 2d 972; and *Hajny v. Robinson Milling Co.,* 156 Kan. 506, 134 P. 2d 398, and other cases that stand for

the general proposition that findings of fact and conclusions of law of the trial court must be consistent with the judgment rendered. The rule announced in the cases mentioned is, of course, sound and relied upon by this court when applicable. It does not support Bank here. In simple terms, the trial court found no agreement to obligate Bank's own funds, but rather a promise to pay or direct payment from Barkley funds under its control. The findings referred to two distinct sources of funds and are not in anywise inconsistent.

Finally, Bank contends the doctrine of estoppel should have been invoked to preclude recovery by Kirkpatrick. On this point Bank's argument appears to be that Kirkpatrick concealed her claim that Bank was liable until she learned of Barkley's bankruptcy; and that Kirkpatrick's knowing failure to notify Bank of its obligation was prejudicial to Bank. Bank cites *Pelischek v. Voshell*, 181 Kan. 712, 313 P. 2d 1105, in which the doctrine of estoppel is discussed in depth and the elements thereof succinctly delineated in this fashion:

". . . With respect to estoppel it has been held that in order to constitute an estoppel (1) there must have been a false representation or concealment of material facts; (2) it must have been made with knowledge, actual or constructive, of the facts; (3) the party to whom it was made must have been without knowledge or the means of knowing the real facts; (4) it must have been made with the intention that it should be acted upon, and (5) the party to whom it was made must have relied on or acted upon it to his prejudice. . . ." (p. 717.)

Bank does not attempt to specifically relate the elements enumerated to the facts of the instant case, and we shall not burden this opinion with a lengthy dissertation on the subject. Briefly, with respect to the elements of estoppel, there is no evidence of false representation by Kirkpatrick. With regard to concealment, the record discloses that Jackson knew the full state of affairs. He knew of Kirkpatrick's bill and that five hundred dollars had been paid; he knew that he had promised to see that it was paid; he knew that he could have directed that it be paid; and he knew that there were sufficient funds available for the payment thereof. In view of the promise made, Kirkpatrick's billing to Barkley in the first instance was not misleading. Moreover, there is no showing that Bank acted to its detriment in reliance on the alleged concealment. Bank was privy to the day by day status of Barkley's financial condition, Kirkpatrick was not; and the record indicates that during

the time in question Bank proceeded to setoff funds in Barkley's account against the indebtedness to the Bank. Such action was detrimental to Kirkpatrick, rather than to Bank and also amounted to a breach of Bank's promise. It would not be justifiable to grant Bank equitable relief in a situation where it reduced its own loan account with Barkley to the detriment of Kirkpatrick after making assurance the accounting fees would be paid.

For the reasons set forth the judgment of the trial court is affirmed.