(588 P.2d 463)
No. 49,171

SERVICE IRON FOUNDRY, INC., *Appellant,* v. M. A. BELL COMPANY
and PARTICULATE CONTROLS, INC., *Appellees.*

Opinion filed November 22, 1978.

*Thomas D. Kitch,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, for appellant.

*Charles P. Efflandt* and *Robert C. Foulston,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, for appellees.

Before FOTH, C.J., ABBOTT and REES, JJ.

ABBOTT, J.: This is an action instituted by Service Iron

Foundry, Inc., (Service Iron) to recover money damages for breach of warranty arising from the purchase of a pollution control unit for use at its foundry in Wichita, Kansas. The trial judge directed a verdict at the close of plaintiff's evidence in favor of the defendant M. A. Bell Company (MABCO). The jury subsequently returned a verdict against the remaining defendant, Particulate Controls, Inc., (Particulate) in the amount of $52,854.59.

The plaintiff, Service Iron, appeals, alleging that:

(1) The trial judge committed error when he sustained defendant MABCO's motion for judgment at the close of plaintiff's evidence;

(2) The trial judge committed error when he excluded certain evidence tending to prove that MABCO independently warranted the pollution control unit and that plaintiff relied upon such warranty when purchasing the unit;

(3) The trial judge improperly excluded evidence of the insolvency of Particulate; and

(4) The trial judge committed error when he restricted plaintiff's damages to the purchase price of the pollution control unit and incidental expenses rather than to the cost of replacing the unit with one that would perform as warranted.

Particulate did not appeal or cross-appeal from the judgment and does not participate in the appeal. We are advised that Particulate has no assets with which to satisfy the judgment against it.

The plaintiff makes gray iron castings in its foundry. Plaintiff was aware as early as 1969 that some action would be necessary to control the emissions from its foundry in order to comply with the Kansas air pollution control laws and regulations.

MABCO, in addition to manufacturing foundry supplies, acted as a distributor and sales agent for other suppliers and manufacturers. It has a reputation in the foundry trade for selling reliable products. Plaintiff had done business with MABCO for many years. It appears from the record, however, that plaintiff learned from a pig-iron salesman for a different company that a pollution control device was available through MABCO. The pollution control device in question had been developed by W. M. Peterson while employed full time as "technical representative" for MABCO. W. M. Peterson at all times material to this case re-

mained a full-time employee of MABCO. The pig-iron salesman called Peterson at MABCO and informed him of plaintiff's interest in the pollution control device designed by Peterson, built by MABCO, and installed at the Richland Foundry in Belleville, Illinois. Plaintiff first expressed interest in the early 1970's. Peterson caused a quotation to be mailed to plaintiff from MABCO along with a reprint of an article written by Peterson and published in *Foundry* magazine.  ·

Other facts are necessary for one to fully understand this case. MABCO sold pollution control devices on a commission basis for other manufacturers. They were expensive, and MABCO became concerned in the late 1960's that many small foundries which could not afford the expensive devices would be forced out of business. Peterson, a long-time employee of MABCO, was asked to develop a cheaper pollution control device. Peterson agreed, but only on the condition that the device would be manufactured and marketed by his own company.

Peterson spent about one and a half years in research and development of a pollution control device. He worked on the device during his normal work days at MABCO and at his home in the evenings. An experimental unit was installed in Decatur, Illinois, in 1969. The cost of development of this unit was absorbed by MABCO and the foundry where it was installed. Peterson did all of the design work on the unit. He then wrote an article on the Decatur unit and published it in *Foundry* magazine. He submitted the article as W. M. Peterson, Technical Representative of M. A. Bell Company, St. Louis. It was a reprint of this article that MABCO mailed to plaintiff along with its quotation.

Peterson made design changes and a second unit was manufactured, sold and installed at Richland Foundry, Belleville, Illinois. This was the unit the pig-iron salesman told plaintiff about. The Richland unit was installed in 1970. Peterson then applied for a patent and, along with MABCO, decided to incorporate. They entered into a pre-incorporation agreement on March 23, 1970, wherein it was agreed to form Particulate Controls, Inc., to design and manufacture pollution control devices. The initial capitalization was $1,000, of which 90 percent was contributed by Peterson and 10 percent by MABCO. Ownership in the corporation was to be in the same percentages. No additional capital has been contributed by either party.

Particulate was formed in the state of Missouri pursuant to the pre-incorporation agreement. There were two directors and it was provided that one director had to be MABCO's choice. Particulate's registered office has the same address as MABCO. Particulate has never had an employee other than Peterson, and its only office has been Peterson's desk at MABCO. Peterson continued to work full time at MABCO after Particulate was formed, and he was still so employed at the time of trial. Additionally, the agreement provided that neither Peterson nor MABCO could sell their stock in Particulate without first offering it to the other on the same terms and conditions as would be negotiated with any prospective purchaser.

Particulate then entered into an exclusive sales agreement with MABCO, granting MABCO exclusive sales rights to Particulate pollution control devices and requiring Particulate to use MABCO's facilities to manufacture the first three devices, the sale from which MABCO was to receive cost plus 50 percent. Particulate was to reimburse MABCO *only* from the proceeds of the sale of the pollution control devices. Particulate could not cancel, alter or modify the exclusive sales agreement without the approval of 100 percent of its stockholders. Since MABCO owned 10 percent of Particulate stock, it could block any change in the agreement. All of the documents were prepared by MABCO's attorney, although Peterson had independent legal advice before he signed any of the documents.

In January of 1972 Peterson, at plaintiff's request, went to Wichita to discuss the pollution control device. Peterson was the only employee of MABCO who had technical knowledge of pollution control devices and he handled all inquiries concerning them. Testimony was presented that Peterson inspected plaintiff's facilities and assured plaintiff that the unit would enable plaintiff to comply with the Kansas code. That same month plaintiff requested an updated quotation which was supplied by a letter dated February 7, 1972. Plaintiff then consulted with the Kansas health department officials who believed afterburners were necessary. Plaintiff called Peterson at MABCO and informed him of the comments from the health department. Peterson had no prior experience installing afterburners, but agreed to revise the quotation to include afterburners without telling plaintiff of his lack of experience. A second quotation was for-

warded to plaintiff on February 14, 1972. The quotations of February 7 and February 14, 1972, were identical with two exceptions not material to this opinion. Both quotations were on MABCO stationery and signed by Richard E. Long, Sales Representative.

On March 31, 1972, plaintiff's president wrote to MABCO, to the attention of W. M. Peterson, Technical Representative, advising that the department of health had reviewed the results of the operation of the experimental unit at Decatur, Illinois, which had been reported in the June 1970 issues of *Foundry* magazine, and had determined that such a unit installed at plaintiff's plant would not comply with the Kansas code. Plaintiff emphasized it was interested in the unit, but wanted to be sure it met the Kansas code. MABCO was invited to make any necessary changes and submit a new quotation.

On April 3, 1972, Peterson signed a letter on MABCO stationery in his capacity as technical representative of MABCO that stated in pertinent part:

"In answer to your letter of March 31, 1972, I would suggest that you read the enclosed test data which was obtained at Richland Foundry, Belleville, Illinois, on June 28, 1971. This cupola would be about the size of your operation and *you will see that it would be well within the Kansas Code. In fact, this installation emitted about one-third of that allowable* and I would predict with reasonable scrap that you would obtain approximately the same results. As far as the after burner what will occur in *our unit* . . . ." (Emphasis added.)

The unit under consideration by plaintiff was the unit installed at Richland Foundry, Belleville, Illinois, and not the experimental unit at Decatur, Illinois.

After further conferences, a formal order was placed and accepted on June 20, 1972. This was accomplished by MABCO forwarding a two-page letter dated June 15, 1972, to plaintiff on MABCO stationery. The letter was identical to the February 14, 1972, quotation and nearly identical to the February 7, 1972, quotation. The quotation, excluding the heading, reads:

"In line with the request received from *our Mr. W. M. Peterson,* we are pleased *to pass on* the following quotation *from Particulate Controls, Inc.,* covering a cupola effluent suppression unit for your cupola:

"1 - only Water operated cupola effluent suppression unit for your No. 3½-51″ shell diameter cupola (including cupola cap, cross section, exhaust stack, water storage tank, pump, cyclone separator, vibratory screen, after burner, all piping for unit controls and particulate removal devices). Service Iron Foundry, Inc. to furnish installation, including all erection, necessary cupola modifications, foundations, wiring, piping to unit, and refractories—including installation of same.

"Testing for particulate matter content will be conducted by MABCO personnel. The method used to test, unless another is agreed to by both parties, will be as outlined in the booklet WP-50, 7th Edition, entitled, 'Methods for Determination of Velocity, Volume, Dust, and Mist Content of Gasses,' as published by Western Precipitation Division of Joy Manufacturing Company of Los Angeles. Any additional testing will be at customer's expense.

"It is understood that the efficiency of this unit is based on the use of clean, properly sized coke, metal charge, and additives, and that predetermined mutually agreeable conditions of cupola operation (melting rate, air volume, air pressure, etc.,), to be confirmed in the purchase agreement, shall be used when testing the finished installation.

"*Particulate Controls, Inc. advise that they will meet the State of Kansas Air Pollution Emission Control Regulations as dated January 1, 1972,* which includes the installation of an after burner to meet the Kansas Code.

"PRICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $29,750.00

"F.O.B.                  Point of Shipment

"Shipment:        Approximately 16 weeks

"Terms:           35% with order

                         35% at time of shipment

                         30% Thirty (30) days following

                             date of shipment

"Invoicing by and payments to *Particulate Controls, Inc.*

"Above price firm for thirty (30) days from the date of this quotation.

                         Very truly yours,

                         /s/ Richard E. Long

                         Richard E. Long, Sales Representative

REL:lk

c.c.'s Messrs. W. H. Mook

                 W. M. Peterson

"Your signature *along with that of Mr. Peterson's* in the spaces provided at the bottom of this letter, will service [*sic*] as Service Iron Foundry, Inc.'s formal order *to Particulate Controls, Inc. and Particulate Controls, Inc.'s formal acceptance.*

ACCEPTED:       /s/ Floyd C. Bowers Pres. Date: June 20, 1972

                         Service Iron Foundry, Inc.

                         /s/ William M. Peterson Date: 6/22/72

                         Particulate Controls, Inc."

(Emphasis added.)

After the unit was installed, a test run in July of 1973 revealed that Service Iron was not in compliance with Kansas law. The unit was ultimately replaced (several components of the unit were incorporated into the new unit) and plaintiff brought suit against Particulate and MABCO for breach of warranty and requested damages in the amount of $112,341.34. When the case was tried, the trial court refused to permit plaintiff to offer the testimony of

its president, Floyd C. Bowers, that Peterson had orally warranted the device between April 3 and June 20, 1972, on the ground that the order and acceptance of June 15, 1972, constituted the agreement between the parties and that any testimony by Bowers would violate the parol evidence rule. Plaintiff unsuccessfully argued that the provisions of the June 15 quotation would not conflict with evidence of an independent warranty from MABCO to induce the purchase and thus would not violate the parol evidence rule. Bowers also testified that Peterson had never told him at any time prior to the order being placed that Peterson was representing Particulate. In fact, when Peterson executed the acceptance of the order on June 22 in St. Louis, he sent six copies of the order to plaintiff, using MABCO stationery, which he signed as technical representative of MABCO. It appears from the record that Particulate stationery was used for the first time in correspondence with plaintiff after the unit was installed and a notice of noncompliance was received.

At the close of plaintiff's evidence, the trial court sustained MABCO's motion for judgment and dismissed plaintiff's cause of action against MABCO on the ground that MABCO was not liable to plaintiff as a matter of law.

In ruling on a motion for a directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and when the evidence is such that reasonable minds can reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. The same basic rule governs appellate review of a motion for a directed verdict. *Frevele v. McAloon,* 222 Kan. 295, 564 P.2d 508 (1977); *Ellis v. Sketers,* 1 Kan. App. 2d 323, 564 P.2d 568 (1977).

The plaintiff tried the case on the theories that (1) MABCO independently warranted the unit, and (2) that Particulate was actually MABCO's alter ego and instrumentality, the primary purpose of which was to enable MABCO to retain the services of a highly-valued employee. When Floyd Bowers, plaintiff's president, testified, he was not allowed to go beyond the written agreement between Particulate and plaintiff contained in the letter quotation of June 15, 1972, and show an independent warranty. We believe that was error, as was the trial court's action in sustaining MABCO's motion for judgment at the close of plaintiff's evidence.

MABCO successfully contended that it was not a party to the contract. It cites the rule that if a contract is signed by a known agent acting in the scope of its authority for a disclosed principal, the agent is not liable on the principal's contract, but rather the contract is that of the principal alone. This is the general rule in Kansas. *United Packinghouse Workers v. Maurer-Neuer, Inc.*, 272 F.2d 647 (10th Cir. 1959); *State, ex rel., v. Triplett*, 213 Kan. 381, 517 P.2d 136 (1973); *Kirkpatrick v. Seneca National Bank*, 213 Kan. 61, 515 P.2d 781 (1973). As we construe plaintiff's position, however, plaintiff does not contend this rule is inapplicable; its contention is that MABCO independently warranted the pollution control device.

Peterson obviously was wearing two hats—one as an authorized agent of MABCO and one as president of Particulate. MABCO claims to be the agent for Particulate in the sale, and contends it disclosed that fact in the February 7, February 14, and June 15, 1972, letters referred to above. However, an agent may pledge its own individual credit or responsibility and may warrant an item in such a manner that the warranty will be enforceable against the agent (MABCO), even though the principal (Particulate) has also made a similar warranty. 3 C.J.S., Agency § 367 (1973); 77 C.J.S., Sales § 305 (2) (1952); 3 Am. Jur. 2d, Agency § 293, p. 654 (1962). In *Kirkpatrick*, 213 Kan. at 67, the Kansas Supreme Court impliedly if not explicitly adopted this rule. In *Kirkpatrick* the bank informed a third party that all of the proceeds of the debtor's work were coming to the bank; that the bank was authorizing payment of the debtor's bills; and that as long as the bank was handling the debtor's account, it would see that the accounting fees due to the third party for services rendered would be paid. The accounting services performed were of benefit to the bank in that the debtor was indebted to the bank, and the accountant not only furnished accounting information to the bank but discovered the debtor was due a tax refund in excess of $5,000 which was refunded and paid into the bank. After the accountant billed the bank, the tax refund came into the bank's possession and the bank reduced the debtor's indebtedness to the bank by $11,000. The bank paid $500 on the accounting fees and then disclaimed any liability to pay the remainder of the bill. The bank took the same position that MABCO takes in this case,

which was that the bank was merely the agent of the debtor and, having disclosed its principal, was not liable on a contract negotiated for that principal. The trial judge found the bank had made an independent promise to the accountant and that the accountant had entered into a contract based on that independent promise; that performance of the contract was beneficial to the bank and that injustice would result if the independent contract was not enforced. The Supreme Court affirmed the trial court, applying the doctrine of promissory estoppel.

MABCO contends that plaintiff is barred from showing an independent agreement by the parol evidence rule as set forth in the Kansas Uniform Commercial Code, K.S.A. 84-2-202. That statute provides in part:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

"(a) by course of dealing or usage of trade (section 84-1-205) or by course of performance (section 84-2-208); and

"(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

MABCO then argues that plaintiff's president admitted that the offer and acceptance in the letter of June 15, 1972, was the contract by which plaintiff purchased the device and concludes from that admission that the contract was intended by the parties to be a final expression of their agreement. Although MABCO denies giving an independent warranty, it argues that even if one was given prior to June 15, 1978, it would not be admissible due to the written agreement.

We do not agree. The contract was between the plaintiff and Particulate. MABCO was not a party to the written instrument. The parol evidence rule is not applicable to an agent who acts for a disclosed principal in the execution of a contract, for that agent does not become a party to the contract between the disclosed principal and the other party to the contract. The Supreme Court dealt with an analogous situation in *Beckett v. Miller*, 110 Kan. 479, 204 Pac. 539 (1922), wherein Kline and the defendant, Miller, entered into a written contract for the sale of land. It was orally agreed among Kline, Miller, and Beckett that Miller would

pay Beckett's commission. The court held the parol evidence rule inapplicable, noting that Beckett was not a party to the written sales agreement. See also 30 Am. Jur. 2d, Evidence § 1029, p. 164 (1967).

The language in *Harriss, Magill Co. v. Rodgers Co.*, 143 Va. 815, 830, 129 S.E. 513 (1925), is also in point. There the court stated:

"Applying this rule to the defense, it becomes plain that the evidence of an oral agreement tending to establish a personal contract or a warranty directly between the plaintiffs and defendant was admissible, because the contract was distinct from and collateral to the main contract made with the principal of the defendant, that principal not being bound by the contract. *Such a collateral contract is not within the parol evidence rule because it does not vary or contradict the terms of the written agreement made between the parties to it, although one of the parties is acting through an agent.*" (Emphasis added.)

Evidence concerning the alleged independent warranty, if otherwise admissible, should have been received by the trial court.

Nevertheless, MABCO argues that plaintiff is seeking to recover damages for alleged violations of the Kansas Uniform Commercial Code (UCC). Specifically MABCO alleges that plaintiff is seeking to recover for the breach of an express warranty (K.S.A. 84-2-313), the breach of an implied warranty of merchantability (K.S.A. 84-2-314), and for a breach of an implied warranty of fitness for a particular purpose (K.S.A. 84-2-315). It correctly notes that under K.S.A. 84-2-314 and K.S.A. 84-2-315 only a seller may be held liable for the breach of the implied warranties of merchantability and fitness for a particular purpose. Therefore, an agent contracting on behalf of a disclosed principal and within the scope of its authority cannot be held liable for breach of an implied warranty. *Smith v. Platt Motors, Inc.*, 137 So.2d 239 (Fla. App. 1962). MABCO is also correct that under K.S.A. 84-2-313, coverage of express warranties extends only to *sellers* of goods. The UCC, however, does not cover warranties made in non-sales transactions such as an independent warranty by an agent that has disclosed its principal. K.S.A. 84-1-103 provides that unless displaced by a particular provision of the UCC, the law relative to principal and agent and to estoppel supplements the UCC provisions. As we have earlier noted in this opinion, the ability of an agent to make an independent warranty has long been recognized at common law. Further support for the position

that the UCC does not govern the independent express warranty that MABCO allegedly gave is found in the official UCC comments to section 84-2-313 on express warranties where it is provided:

"2. Although this section is limited in its scope and direct purpose to warranties made *by the seller to the buyer* as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or *to the direct parties to such a contract.*" (Emphasis added.)

We are faced here with the question of whether reasonable minds might differ as to whether or not MABCO expressly warranted the pollution control device. We are cognizant of the fact the trial judge found that MABCO never specifically warranted the device. Even though the evidence of an express warranty is skimpy, we are persuaded that under the facts reasonable minds might differ as to whether MABCO had made an independent express warranty.

Plaintiff had been a customer of MABCO's for many years; it was aware of MABCO's excellent reputation in the foundry business for selling reliable products. The facts indicate plaintiff was clearly relying on MABCO to come up with a device that would comply with the Kansas code. Plaintiff's president testified all contacts of any nature were made with MABCO, and Peterson never disclosed to plaintiff that he represented anyone other than MABCO until after the contract was signed. This fact is tempered somewhat by Peterson's name having been typed under the signature line for Particulate on the three proposal letters. Plaintiff's president further testified he thought MABCO warranted the device or he would not have purchased it. MABCO suggests that it is immaterial what Bowers thought. Had the testimony been presented to the jury in the same form and objected to, we would agree; however, the evidence was in the form of a proffer. We conclude that when all of the exhibits are considered with the testimony of the parties and in conjunction with MABCO's letter of April 3, 1972, assuring plaintiff that the unit would be well within the Kansas code, a reasonable mind which was appropriately instructed on the law of principal and agent and on estoppel might well have concluded MABCO gave an express warranty or was estopped to deny that it did.

The trial judge additionally found as a matter of law that

MABCO could not be held liable for Particulate's warranties under the alter ego or instrumentality doctrine. Our standard of review again is whether reasonable minds could differ as to the conclusion to be drawn from the evidence.

Each case involving the disregard of a corporate entity must be decided upon its own special facts. *Kilpatrick Bros., Inc. v. Poynter,* 205 Kan. 787, 473 P.2d 33 (1970). A corporation and its stockholders are presumed separate and distinct whether the corporation has many stockholders or only one. *Amoco Chemicals Corporation v. Bach,* 222 Kan. 589, 567 P.2d 1337 (1977). A holding or parent company has a separate corporate existence and is treated separately from its subsidiary in the absence of circumstances justifying disregard of the corporate entity. *Quarles v. Fuqua Industries, Inc.,* 504 F.2d 1358 (10th Cir. 1974). While the debts of the corporation are not the individual indebtedness of its stockholders, in an appropriate case the corporate form will be disregarded and the corporation and its stockholders may be treated as identical. *Amoco,* 222 Kan. at 589, Syl. ¶ 2.

While the power to pierce the corporate veil is to be exercised reluctantly and cautiously (*Amoco*), the corporate entity can be disregarded if it is used to cloak or cover fraud or illegality or to work injustice, or if necessary to achieve equity (*Kilpatrick*). The doctrine of alter ego fastens liability on an individual or corporation which uses a corporate entity merely as an instrumentality to conduct its own business, such liability arising from fraud or injustice perpetrated on third parties who deal with the corporation. Under the doctrine the courts will disregard the corporate entity and hold an individual responsible for those acts which were knowingly and intentionally done in the name of the corporation. *Kirk v. H. G. P. Corporation, Inc.,* 208 Kan. 777, 494 P.2d 1087 (1972). Furthermore, the separate entity of a corporation and the persons who comprise it may be cast aside and disregarded if it appears that the corporation is merely a business "conduit" through which an individual or corporation does business and that to recognize the separate entity of the corporation would allow fraud on a third party. *Sell v. United States,* 336 F.2d 467 (10th Cir. 1964); *Kirk,* 208 Kan. at 780.

In *Amoco,* the Kansas Supreme Court enumerated some of the significant factors which would justify disregarding a corporate entity. Those factors are undercapitalization of the corporation,

failure to observe corporate formality, nonpayment of dividends, siphoning of corporate funds by dominant stockholders, nonfunctioning of other officers or directors, the absence of corporate records, the use of the corporation as a facade for the operations of the dominant stockholder or stockholders, and the use of the corporate entity in promoting injustice or fraud. In *Intern. U., United Auto., etc. v. Cardwell Mfg. Co.*, 416 F. Supp. 1267, 1286 (D. Kan. 1976), the district court enumerated the following factors which may be considered: (1) The parent corporation owns all or a majority of the capital stock of the subsidiary; (2) the parent and subsidiary corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribed to all of the capital stock of the subsidiary or otherwise causes its incorporation; (5) the subsidiary has grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation, or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division; (9) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary, but take direction from the parent corporation; (10) the formal legal requirements of the subsidiary as a separate and independent corporation are not observed. No one factor, however, is conclusive. *Collins v. United States*, 386 F. Supp. 17 (S.D. Ga. 1974).

Examining the evidence in the light most favorable to the party against whom the verdict was directed, as this court is bound to do on appeal, we conclude that reasonable minds might differ on whether Particulate was the mere alter ego or instrumentality of MABCO. The record reveals that all of the officers of Particulate were employees of MABCO with the exception of the secretary, who was Peterson's wife. MABCO and Particulate have a common officer and formerly a common director. Particulate had no employees other than William M. Peterson, and he did not draw a salary. Peterson received his full salary from MABCO and no records were kept pertaining to what percentage of his time was spent in behalf of the two corporations.

MABCO owned only 10 percent of the stock, but by virtue of the pre-incorporation agreement entered into between MABCO

and Peterson, it was assured of control of Particulate. That agreement provided that Peterson and MABCO would vote their shares of stock so as to elect at least one director designated by MABCO. The articles of incorporation provided that the number of directors of Particulate was to be two. In addition, Peterson and MABCO agreed to vote their shares of stock so as to insure the election of an individual designated by MABCO as the vice-president of Particulate.

Peterson paid in $899 cash to Particulate and assigned any and all patents or patent applications for air pollution control devices in his name to Particulate Controls, Inc., in exchange for 900 shares of stock. MABCO paid $100 and received 100 shares of stock. In the pre-incorporation agreement, MABCO recognized that the pollution control device was developed by Peterson while he was employed by MABCO and that MABCO had provided the funds and other aid for the development of the device. By virtue of this agreement MABCO purported to give up all rights to the device which it may have had by reason of its employee developing the device and its financial aid in the development. However, by a later provision in the agreement, Particulate was prohibited from transferring the patent or patent application without the express consent of MABCO.

By virtue of the pre-incorporation agreement, MABCO was made the exclusive sales agent of Particulate and was to receive 10 percent of all gross sales as compensation. If MABCO did not sell in any area, then Particulate was free to sell the pollution control device on its own upon giving notice to MABCO. However, even if Particulate sold a device on its own, MABCO was to receive the larger of 10 percent of the sale price less the costs of sale, or 3 percent of the sale price.

Although an officer of MABCO testified that Particulate was not obligated to use MABCO's facilities to produce a pollution control device, we note paragraph five of exhibit C to the pre-incorporation agreement provides that "[i]t is understood and agreed that Particulate shall so use the facilities and personnel of MABCO in connection with those three devices." Particulate was thus obligated to produce the first three devices (all that were ever produced) in MABCO's facilities. Particulate was to reimburse MABCO for the cost of producing the devices plus 50 percent, with the cost to be determined by using MABCO's cost account-

ing procedures. Thus, MABCO would make not only a sales commission on the first three units, but also a profit of 50 percent of the actual cost of producing the units.

MABCO further contends there is no evidence that it ever financed Particulate. However, by virtue of the above-mentioned "manufacturing costs reimbursement" formula, MABCO could not be paid its cost of production for any one device until the first three units had been sold. This is, in essence, a method of financing. Furthermore, it is undisputed that MABCO paid the research and development costs of the device as well as Peterson's salary while he was performing the research. It continued to pay his full salary after Particulate was formed and operating, and no effort was made to ascertain the amount of time spent on Particulate's business or expenses incurred which would have been properly chargeable against Particulate. Although the trial judge found that MABCO did not finance Particulate, there is ample evidence to support a reasonable mind's conclusion that it did.

The trial court also found that Particulate was not undercapitalized. The corporation started in business with $999. The record indicates that MABCO's attorneys drew all of the agreements and corporate papers and that their fee was paid by MABCO rather than by Particulate. As money from the sale of the three devices came into the corporation in 1971 and 1972, it was paid out in the form of bonuses to Peterson and MABCO. The trial judge placed significance on the fact that the money was paid out in the form of bonuses prior to any claim being made that the pollution control device did not function properly. Another inference that the trial judge could have drawn from the fact the profits were paid out so promptly in the form of bonuses is that it was done to place the money beyond the reach of anyone who might have had a claim against the company for liability as the result of a malfunctioning pollution control device. At the end of 1972, Particulate had a balance of only $1,101.96, and by the end of 1973 it had a negative balance. Generally it can be said that stockholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risk of loss, this is ground for denying a separate entity privilege. 1 Fletcher, Cyclopedia of the Law of Private Corporations § 44.1, p. 249 (perm. ed. 1974).

The only board meetings conducted by Particulate after the original incorporation were the annual meetings which appear to have been primarily concerned with paying out the profits in the form of bonuses.

While Peterson testified that as president he was responsible for the day-to-day decisions concerning the business affairs of Particulate, it must be remembered that he was a long-time employee of MABCO; and although he was in Wichita when the plaintiff signed its offer to purchase, the fact that he apparently felt a need to go back to St. Louis before signing the acceptance on behalf of Particulate might well be indicative that it was necessary to obtain the permission of someone at MABCO before he could agree to it. Given those facts, plus the fact that Peterson's sole income appears to have been his salary and sales commissions from MABCO, a jury might well have determined that Peterson was the mere tool of MABCO.

We are not here concerned with whether or not there is ample evidence to support the findings of the trial judge; our only concern is whether or not there was sufficient evidence contrary to the findings on which reasonable minds might differ. We conclude that there was, and that the trial court should have submitted the question of alter ego or instrumentality doctrine to the jury under proper instructions.

Plaintiff then contends that the trial court incorrectly instructed the jury on the measure of damages. It is plaintiff's position that it was entitled to recover the amount necessarily spent in acquiring and installing a unit that would comply with the Kansas code. In addition to the cost of the replacement unit, plaintiff requests attorney fees in connection with the administrative hearing, the fee charged for testing the unit, a charge by a consulting engineer, and lost profits while the new unit was being installed.

The trial judge instructed on and allowed recovery for the price of the pollution control device purchased from Particulate, attorney fees incurred in connection with the administrative hearing, testing costs, lost profits resulting from the suspension of business while the replacement unit was being installed, and consulting fees paid in conjunction with the faulty unit. He disallowed recovery of the cost of acquiring and installing the new unit in the amount of $94,422.78 and the consulting engineer fee

in connection with designing a new unit. In addition, he allowed as damages the cost of installation of the faulty unit.

Plaintiff contends that the larger sum ($112,341.34) is the correct sum to be awarded for its damages under the Kansas Uniform Commercial Code and cites K.S.A. 84-2-714 and K.S.A. 84-2-715 to support its position. K.S.A. 84-2-714 reads as follows:

"(1)   Where the buyer has accepted goods and given notification (subsection [3] of section 84-2-607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach *as determined in any manner which is reasonable.*

"(2)   The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless *special circumstances* show proximate damages of a different amount.

"(3)   In a proper case any incidental and *consequential damages* under the next section may also be recovered." (Emphasis added.)

K.S.A. 84-2-715 reads:

"(2)   Consequential damages resulting from the seller's breach include

"(*a*)   any loss resulting from general or particular requirements and needs *of which the seller at the time of contracting had reason to know* and which could not reasonably be prevented by cover or otherwise." (Emphasis added.)

Plaintiff then argues that the seller had reason to know about the plaintiff's urgent need for a pollution control device and the consequences that would befall plaintiff if the device did not meet state standards. White and Summers, Uniform Commercial Code, § 10-2 (1972), tends to lend support for that position. Further support for plaintiff's position is found in *Murray v. Kleen Leen, Inc.*, 41 Ill. App. 3d 436, 354 N.E.2d 415 (1976). In that case, the term "special circumstances" was held to cover replacement costs which went beyond the mere substitution of new goods for the ones proven to be defective when necessary to compensate the buyer for all the damages he had in fact suffered. See also *Lanphier Const. Co. v. Fowco Const. Co.*, 523 S.W.2d 29 (Tex. Civ. App. 1975) (faulty asphalt led to redoing entire job).

We are here faced with a situation where a plaintiff had an existing foundry. Although expensive pollution control devices were available that would comply with the Kansas code, the plaintiff attempted to purchase a cheaper unit. It was awarded damages from Particulate that included damages for "special circumstances" as well as "incidental and consequential dam-

ages" allowable under K.S.A. 84-2-714 and K.S.A. 84-2-715. It was reimbursed for all expenses incurred in installing and testing the faulty pollution control device as well as expenses for the time its plant had to shut down while a new device was being installed. It would be patently unfair to MABCO to allow plaintiff to recover damages for a more expensive unit under the circumstances and facts of this case. The basic principle of damages is to make a party whole by putting it back in the same position, not to grant a windfall. We conclude the trial judge properly instructed the jury on the issue of damages under the facts of this case.

The judgment is affirmed as to Service Iron Foundry, Inc., and reversed as to M. A. Bell Company.