Continental & C. T. & S. Bank v. Garden City Co.

No. 27,415.

THE CONTINENTAL AND COMMERCIAL TRUST AND SAVINGS BANK et al., *Appellants*, v. THE GARDEN CITY COMPANY et al., *Appellees*.

SYLLABUS BY THE COURT.

1. PROPERTY—*Title and Ownership—Sufficiency of Evidence to Establish.* In an action to enjoin a defendant from dismantling and removing a power line which had been constructed to serve certain lands covered by plaintiff's trust deed, the evidence considered and held sufficient to uphold a finding and judgment that the power line was not built nor paid for by the plaintiff's debtor under whose trust deed plaintiff claimed an interest; and held sufficient to show that the power line was built and paid for by an independent, affiliated corporation with its own funds.

2. CORPORATIONS—*Legal Entity—Stock in One Corporation Owned by Another—Liability of Parent Corporation.* In the absence of fraud or other invidious and vitiating circumstance, the fact that one corporation was instrumental in the formation of another corporation and owned nearly all of the stock of the latter corporation does not have the legal effect of making the parent corporation liable for the debts of the subsidiary corporation nor subject the property of the former to a lien in behalf of a creditor who claims all the assets of the latter corporation under a trust deed.

3. SAME—*Generally.* Other objections to the judgment considered and not sustained.

Appeal from Finney district court; CHARLES E. VANCE, judge. Opinion filed June 11, 1927. Affirmed.

*Edgar Foster* and *Horace J. Foster,* both of Garden City, for the appellants.

*Wm. Easton Hutchison, C. R. Hope* and *A. M. Fleming,* all of Garden City, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action to restrain the defendants from dismantling and removing an electric transmission line in Scott and Finney counties.

The plaintiff claimed that the line was part of the property covered by a trust deed executed to it by the Garden City Development Company to secure a loan of half a million dollars. The loan had been made to enable the borrower to pay $300,000 as the purchase price of some 22,000 acres of Scott county land, and to provide funds for the improvement and development of these lands with the remaining $140,000. By a subsequent agreement with plaintiff the

Corporations, 14 C. J. pp. 52 n. 23, 53 n. 26, 54 n. 29, 55 n. 33, 949 n. 62, 950 n. 72; 7 R. C. L. 26. Injunctions, 32 C. J. p. 351 n. 79.

borrower was permitted to devote $18,000 of the sum intended for development to purchase additional acreage.

The Garden City Development Company was a corporation especially created to take title to and develop the Scott county acreage. The parties instrumental in its incorporation were the Garden City Sugar and Land Company and some of its officers, directors and employees.

One of the improvements contemplated by the development company, and partly on the faith of which that half million loan was made, was the construction of some 18 or 20 miles of transmission line to connect the irrigation wells and pumps on the Scott county lands with the electric power plant of the Garden City Sugar and Land Company. However, owing to other large but necessary expenditures for improvements, the development company did not have sufficient funds to build the projected transmission line, and it was built and paid for (according to defendants' evidence) by the Garden City Sugar and Land Company.

The cost of power to operate the irrigation pumps proved to be too high for profit, and the use of the line was suspended with the permission of the public utilities commission. Later the line was wrecked and partly blown down by high winds, and the Garden City Sugar and Land Company, under claim of ownership, set about the work of removing it for use or disposition elsewhere. This activity precipitated this lawsuit.

Issues were formed and joined, and a trial was had. The trial court made findings of fact and gave judgment for defendants.

Plaintiff appeals, urging various errors, one of which is that a certain finding lacks support in the evidence. That finding reads:

"XII. That all of said sum of $122,000 derived from the loan made by the plaintiff, and a considerable amount of additional funds furnished by the Garden City Sugar and Land Company was spent by the said J. P. Nolan as president of the Garden City Development Company in developing and placing in cultivation and under irrigation the lands of the said company, but no part of said money was used in payment of either labor or materials used in the construction of the power line in question."

In support of its contention that this finding is not sustained by evidence, plaintiff prints extended excerpts from the evidence of a witness who testified from memory—some nine years after the facts had occurred, which testimony if given full credence might possibly have warranted a contrary finding of fact. However, this court dis-

cerns no shortage of testimony to support the challenged finding. A witness testified:

"The transmission line was built during the latter part of 1916 or during 1917. I think most of it in 1917. . . .

"Q. Would you be able to testify as to whether or not the line is always on these section lines? A. Most of it. . . .

"With the exception of the side lines, that is the service lines to the individual pumping plants, it is all on the section lines, I think. . . ."

Another witness, who had been treasurer of the development company and assistant secretary and treasurer of the sugar and land company at the time the transmission line was constructed, brought the books of both corporations into court and showed quite clearly that the sugar and land company caused the line to be constructed at its own expense. The development company had, indeed, turned over to the sugar and land company $25,344.45 towards the construction of the line, but press of other financial demands caused that sum to be returned to the development company. This witness testified:

"Q. Who paid for the labor performed under that contract?

[Counsel for Plaintiff]: "Objected to as incompetent, irrelevant and immaterial.

"The Court: Objection overruled.

[Counsel for Plaintiff]: "This is a mighty serious question in this case.

"By the Court: We will argue when we get through.

"A. The Garden City Sugar and Land Company. It was not to be reimbursed in any manner for that. It was not reimbursed; the total cost of building the line was a little over $38,000. I have a list of all payments made and the items, together with the dates of this total cost of $38,000. . . . The development company ceased operating the line in 1916. . . . The funds of the Garden City Development Company had been exhausted early in the year. . . .

"Q. Did the parties that they entered into the contract to build the transmission line, build it? A. Yes, sir; they built it.

"Q. For the development company? A. They built it; it was paid for by the Garden City Sugar and Land Company. . . .

"Q. Now, Mr. Gillespie, you may turn to your books of the Garden City Sugar and Land Company and show to the court the payments made, if any, for the construction of the Scott county extension pole line. A. On ledger No. 4, Garden City Sugar and Land Company, p. 89, . . . shows the Garden City Sugar and Land Company paid out for construction of the Scott County extension, the net amount of $38,018.12.

"Q. When were those payments made? A. The first payment was made on June 15, 1917, and the closing entry was on November 20, 1917. . . .

"Q. What does, what is shown by the book with reference to the $25,000 item? A. On July 4, 1917, the development company gave a check to the

Garden City Sugar and Land Company for $25,344.41. This was set aside as a special fund given to the company as a special fund for the purpose of building that extension into Scott county.

"Q. What disposition was made of it, Mr. Gillespie? A. They were paid back in cash on July 10, $5,000, on July 20, $5,000, on August 3, $5,000, on August 8, $5,000, on August 10, $5,000, and on August 16, the remainder, $344.41.

"Cross-examination: . . .

"Q. Now, on what date was this $25,000 set aside by the development company to construct this line? A. On July 4, 1917. . . .

"Q. And you did not use it for that purpose? A. No, sir.

"Q. The Garden City Sugar and Land Company did not use it for that purpose? A. No, sir. . . .

"Q. . . . Now, on July 4 the Garden City Development Company paid on deposit with the Garden City Sugar and Land Company, $25,000? A. Yes, sir; $25,344.41. . . .

"Q. Mr. Gillespie, to whom were these charges you have detailed, who were those charges made to, that is, who were they charged to? A. Which charges?

"Q. Building the line, the material furnished? A. It was kept on a special ledger account called the Scott City line extension until the line was built. When the line was completed that account was closed out, and this amount, $38,000, was charged to our regular transmission-line account; on the Garden City Sugar and Land Company books. . . .

"Q. But you had $25,000 on July 4 to carry out this agreement with that the development company made? A. Yes, sir.

"Q. And instead of doing it the way they agreed, you gave them back $25,000 and constructed it by the Garden City Sugar and Land Company? A. Gave them back $25,000 as requested by the development company as they needed it within 30 days.

"Q. You gave it back to them? A. Yes.

"Q. And constructed the line, and now you pretend to state, who loaned you the money, had no lien on the line? A. They have not got a nickel in it.

"Q. But they gave money for building it? A. They have not a nickel in it."

In view of this testimony this court is bound to hold that finding 12 had ample evidence to support it.

It is next argued that in view of finding 21, the lien of the trust deed would attach to the transmission line notwithstanding it was built and paid for by the Garden City Sugar and Land Company. That finding was that the development company was organized "for the purpose of making a profit for the Garden City Sugar and Land Company." Is not that the ultimate purpose which organizers and promoters of corporations usually have in mind when they organize a business corporation? Corporations, other than public, charitable, religious and the like, are organized for the ultimate object of pros-

pective profits for the stockholders; and the fact that the Garden City Sugar and Land Company was the majority stockholder in the development company did not subject the property of the parent company to a lien for the payment of the development company's debts. All this is text-book law in Kansas and elsewhere. (*A. T. & S. F. Rld. Co. v. Davis,* 34 Kan. 209, 8 Pac. 530; *A. T. & S. F. Rld. Co. v. Cochran,* 43 Kan. 225, 23 Pac. 151; *Golden v. Southwestern Utilities Corp.,* 121 Kan. 793, 250 Pac. 286; 7 R. C. L. 26, 27, 352, 353; 14 C. J. 52-56.)

In *State v. Harvester Co.,* 81 Kan. 610, 615, 106 Pac. 1053, where the contention was made that a subsidiary corporation should be regarded as identical with that of the parent corporation which owned practically all of its stock, this court said:

"We do not understand that when the same persons own all the stock in two or more corporations such corporations thereby lose their separate identity and become merged into each other. (*A. T. & S. F. Rld. Co. v. Cochran,* 43 Kan. 225; *A. T. & S. F. Rld. Co. v. Davis,* 34 Kan. 209; *Pullman Car Co. v. Missouri Pacific Co.,* 115 U. S. 587; *Conley v. Mathieson Alkali Works,* 190 U. S. 406; *Peterson v. Chicago, Rock Island & Pac. Ry.,* 205 U. S. 364.)"

Appellant cites cases (and the books are full of them) where corporate entities and the convenient fiction of a corporation's juristic individuality apart from that of its incorporators or stockholders have been swept aside in dealing with fraud, restraint of trade, and the like; but nothing of that invidious character appears in this record. Indeed, it seems perfectly clear that the plaintiff knowingly loaned this large sum of money to the development company on such security as it could give, and that plaintiff knew the only chance its debtor had to conduct its corporate business with success and thereby repay the plaintiff was by close articulation of its corporate activities with those of the parent company. Indeed, appellant emphasizes, as an argument in its favor, the fact that the preliminary negotiations for this very loan were conducted by the parent company before the development company was organized. But pursuant to such preliminaries and with full information of what it was about, the plaintiff did accept the bonds and deeds of trust of the development company as a sufficient *quid pro quo* for its loan. It does not pretend that the parent corporation or anybody in its behalf deceived it into accepting as security for its loan such assets as the borrowing corporation had to give.

Appellant would attach some significance to the fact that the

charter of the development company was allowed to lapse. But that fact neither enlarges nor diminishes the scope of plaintiff's trust deed, nor strengthens its groundless claim to a lien on the power line constructed by another corporation.

Appellant also invokes the doctrine that where the assets of two corporations have been mingled so that it is impossible to tell which company owns certain property or controlled certain funds, the legal fiction of separate corporate entities can be disregarded in order to give justice to parties dealing with such corporations. But here there was no confusion of assets, no inextricable mingling of funds; the one corporation did loan money to the other and the one did serve the other in various capacities as business firms in good accord are wont to do; the principal stockholder of the parent company had a good deal to say about how both corporations should conduct their affairs, but he did not require either of them, or their officers, to do anything improper or unusual; and notwithstanding the evidence given by the plaintiff's witness testifying from memory nine years after the construction of the power line in dispute, the records of both corporations were produced in court, and that witness' testimony tending to show a mingling of funds or confusion of assets and corporate affairs was effectively demolished.

The other matters urged against the judgment have had our careful attention, but nothing further is discerned which would justify discussion.

The judgment is affirmed.

HOPKINS and HUTCHISON, JJ., not sitting.