(863 P.2d 991)
No. 68,787

VANGUARD PRODUCTS CORPORATION, *Appellant*, v. AMERICAN
STATES INSURANCE COMPANY, *et al.*, *Appellee.*

Opinion
filed November 24, 1993.

*Daniel S. Rabin*, of Berman & Singer, P.A., of Overland Park, for appellant.

*Thomas A. Sheehan* and *Roy Bash*, of Shughart, Thomson & Kilroy, P.C., of Kansas City, Missouri, for appellee.

Before BRISCOE, C.J., GERNON, J., and RICHARD B. WALKER, District Judge, assigned.

WALKER, J.: Vanguard Products Corporation (Vanguard) appeals from the trial court's verdict in Vanguard's action to recover against a public works bond issued by American States Insurance Company (American States).

In 1989, the City of Olathe contracted with E. H. Hall Contractors, Inc., (Hall) for the construction of streets, sewers, and related improvements in the city's Cedar Creek Development. Hall provided a public works bond for the project, which was secured through American States.

In connection with the Cedar Creek project, Hall subcontracted with Consolidated Utilities, Inc., for the installation of concrete

sewer piping. Although Consolidated Utilities was the named subcontractor in the agreement, employees of Consolidated Construction, Inc., installed all of the piping, using Consolidated Construction's equipment.

Vanguard supplied Consolidated Construction with sewer piping for the Cedar Creek project. According to Vanguard's treasurer, Vanguard had supplied Consolidated Construction with materials for various projects for 15 years. During this period of time, Vanguard did not deal with Consolidated Utilities and was unaware that such a corporation existed. When Vanguard asked Consolidated Construction for a copy of the bond and subcontract agreement with Hall, Consolidated Construction provided only a copy of the bond in its unexecuted form.

As work on the Cedar Creek project progressed, Hall made payments for the sewer pipe installation to Consolidated Utilities, which deposited the payments and then transferred the money to Consolidated Construction's account. Occasionally, checks from Hall to Consolidated Utilities would be endorsed and deposited directly into Consolidated Construction's account. Consolidated Construction would use the money in its account to pay its employees and suppliers, including Vanguard.

Although Vanguard provided $188,640 worth of materials for the Cedar Creek project, it received compensation totaling only $74,311. In an attempt to recover the outstanding balance of $114,329, Vanguard filed the present lawsuit against the City of Olathe, Consolidated Construction, C. W. Springer (the sole stockholder of both Consolidated Utilities and Consolidated Construction), Hall, and American States. The district court subsequently dismissed the City of Olathe and Hall from the lawsuit.

After a bench trial, the trial court entered a default judgment in Vanguard's favor against Springer and Consolidated Construction. With respect to Vanguard's claim against American States, the trial court found as a matter of fact that Vanguard was a supplier to a subcontractor (Consolidated Construction) who was not in privity with Hall. The trial court concluded as a matter of law that, pursuant to K.S.A. 1992 Supp. 60-1111 and *Wichita Sheet Metal Supply, Inc. v. Dahlstrom & Ferrell Constr. Co.*, 246 Kan. 557, 792 P.2d 1043 (1990), Vanguard could not recover on the bond issued by American States. The trial court denied

Vanguard's post-trial motion to alter or amend the judgment with respect to American States.

Vanguard challenges the trial court's verdict as contrary to the facts and the law applicable to this case. Vanguard contends that it is entitled to recover under the bond issued by American States because Consolidated Utilities and Consolidated Construction in reality operated as a single entity. American States contends that the trial court's judgment is correct because Vanguard was a supplier to a second tier subcontractor (Consolidated Construction) and, thus, was outside the scope of the protection afforded by the bond.

When a trial court has made findings of fact and conclusions of law, the function of the appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. In reviewing the trial court's decision, the appellate court must accept as true the evidence and all inferences to be drawn therefrom which support the findings of the trial court. Any conflicting evidence or other inferences that might be drawn therefrom must be disregarded. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377-78, 855 P.2d 929 (1993).

K.S.A. 1992 Supp. 60-1111, the public works bond statute relied upon by the trial court in this case, states that parties who contract with public officials to make public improvements in an amount exceeding $10,000 must provide a bond to the State in a sum not less than the total amount of the contract. K.S.A. 1992 Supp. 60-1111(a). The language of the statute allows a person who is due any sum for supplying labor or materials to a contractor or subcontractor to bring an action on the bond within six months after the project is completed. K.S.A. 1992 Supp. 60-1111(b). The protection provided by a public works bond does not extend to suppliers of materials to a second tier or sub-subcontractor. Such suppliers have no lien rights because they are not in privity with the owner, contractor, or subcontractor to the contractor. *Wichita Sheet Metal*, 246 Kan. at 564. If Consolidated Utilities and Consolidated Construction are separate entities, Vanguard is a supplier to a second tier subcontractor and may not recover under the bond.

Are Consolidated Utilities and Consolidated Construction a single entity or separate and distinct corporations? In order to answer this question, a review of the evidence before the court on this point must be made.

There is little doubt that both Consolidated Utilities and Consolidated Construction are closely interlinked. The testimony of C. W. Springer, the president, director, and sole shareholder of both Consolidated Utilities and Consolidated Construction, revealed that the two companies shared the same office and telephone number. Springer's wife performed all bookkeeping tasks, and Springer's accountant prepared combined financial statements for the two corporations. A single payroll was prepared for the employees of both corporations.

As noted by the trial court in its decision, one of the best descriptions of the relationship of Consolidated Utilities and Consolidated Construction is contained in the combined financial statements.

"Consolidated Utilities, Inc. is affiliated through common ownership with Consolidated Construction Company, Inc. The Company is engaged in the construction of water, sewer and drainage lines. The majority of the Company's contracts are subcontracted to Consolidated Construction Company, Inc. These financial statements should be read in conjunction with the combined financial statements of Consolidated Utilities, Inc. and Consolidated Construction Company, Inc."

Despite the indication of a "contractor-subcontractor" relationship between Consolidated Utilities and Consolidated Construction, this appears to have been far too informal and unstructured a relationship for such terminology. There is no evidence in the record to indicate that the two entities ever exchanged correspondence or executed contracts with respect to allegedly subcontracted work.

Springer testified that he formed Consolidated Utilities for the exclusive purpose of bidding on construction projects that required performance bonds. If Springer did not expect that a bond would be required for a project on which he wished to bid, he would submit a bid under Consolidated Construction's name. Although Springer assumed that Hall would require a bond for the Cedar Creek project, it is undisputed that the contractor did

not request a bond from either Consolidated Utilities or Consolidated Construction.

The trial court reviewed this situation and concluded that it presented an issue of first impression in Kansas. The court then proceeded to strictly interpret the law and prior appellate decisions and determined that there was no contract and no privity between Hall and Consolidated Construction. Apparently, the trial court felt that the very existence of two separate corporations was sufficient under Kansas law to place Consolidated Construction on a different tier than Consolidated Utilities. While not addressing the issue explicitly, by its decision the trial court implicitly ruled that Consolidated Utilities and Consolidated Construction were not, in fact, a single entity.

As noted by the trial court in its decision, there are numerous practical problems which militate against expanding the scope of liability for indebtedness on public works bonds. These were summarized in *Wichita Sheet Metal*, 246 Kan. at 563, as follows:

"1. Present bond rates are set on the basis of exposure, which has heretofore been limited to those having lien rights—that is, they are in privity with the owner, contractor, or a subcontractor of the contractor.

"2. A public works bond is not like an insurance policy in that the bond purchaser agrees to indemnify the bond issuer for all claims paid.

"3. Bonding capacity is an important aspect of a contractor's business. The owner of such a business is usually required to sign a personal indemnity agreement. Expanding the list of classifications covered by the bond will reduce the bonding capacity of the business and eliminate many companies from bidding on public works projects.

"4. It will be impossible for a general contractor and its subcontractor to protect themselves as they have no means of determining who potential claimants are."

Despite these considerations, appellate courts in Kansas and elsewhere have exhibited a willingness to look beyond the mere surface features of a business relationship where required in the interests of justice and equity. Although the trial court in this case correctly noted that there are no Kansas appellate cases directly on point, an analogous situation was present in the case of *Neighbors Construction Co., Inc. v. Seal-Wells Construction Co., Inc.*, 219 Kan. 382, 548 P.2d 491 (1976). In *Neighbors*, Seal-Wells (a general contractor) and Valley View (a property owner) formed a joint venture for the construction of an apartment com-

plex. After securing a performance and payment bond, the joint venture entered into a subcontract with Seal-Wells for the construction of the apartment complex. Seal-Wells in turn subcontracted with Neighbors to complete a portion of the construction. Thus, Seal-Wells was present, either alone or in combination, at both the general contractor and first tier subcontractor level.

After construction of the apartment complex was completed, Seal-Wells refused to pay Neighbors for its work. Neighbors filed suit and obtained a recovery under the performance bond. The Kansas Supreme Court upheld the recovery on appeal, rejecting the assertion by the bond surety that there was no direct contract between Neighbors and the joint venture as required by the bond's terms. The court found:

"No evidence was introduced as to the terms of the agreement between the two members of the joint venture. No written construction contract between the joint venture and Seal-Wells appears in the record. It was revealed in oral argument that the cost of construction . . . was the same in the joint venture Valley View contract as it was in the purported joint venture Seal-Wells contract. To say Seal-Wells was not the general contractor on this project would deny the obvious and reject the rule that the law looks to the substance of a transaction and not to its form." 219 Kan. at 386.

In other words, our appellate courts have taken the posture that, where the facts clearly indicate the same parties are involved at different layers of a contractor/subcontractor relationship, a claim of "no direct contract," which is simply another way of saying lack of privity, cannot control the outcome.

This philosophy is mirrored in federal cases construing the Miller Act, 40 U.S.C. § 270a *et seq.* (1988), which is the statutory scheme which requires contractors to obtain payment and performance bonds for certain public works contracts entered into with the federal government. The federal courts typically determine a party's status as a claimant under a bond by looking to the actual role performed by the party on the project instead of the label by which the party is designated. Here again, the rule is that substance will control over form. See *Glen Falls Insurance Company v. Newton Lumber & Mfg. Co.*, 388 F.2d 66, 69 (10th Cir. 1967), *cert. denied* 390 U.S. 905 (1968); *United States v. Ft. George G. Meade, Etc.*, 186 F. Supp. 639, 652 (D. Md. 1960).

Having determined that there are circumstances in which a court can look beyond the formal designations of the parties in a contractor-subcontractor relationship to determine liability under a public works bond, we must go back to the question of whether justice in this case requires disregard of the separate corporate forms maintained by Consolidated Utilities and Consolidated Construction. In short, we must return to the question of whether they are truly separate entities occupying the first and second tier of the subcontractor ladder in this case or whether, in reality, they are a single entity occupying but one tier.

When faced with similar situations, other courts have felt compelled to engage in an examination of the specific areas of togetherness or separation with respect to the sister corporations. In *United States v. Farina Construction Corporation*, 261 F. Supp. 278 (D. Mass. 1966), *aff'd* 376 F. 2d 811 (1st Cir. 1967), the court conducted such an examination and concluded that truly separate entities were in existence. The Farina Construction Company (Farina) obtained payment and performance bonds after entering into a construction contract with the United States. Edward DeGroot, Inc., (Edward) subcontracted with Farina to perform the heating, ventilating, and air-conditioning work required under the prime contract. Edward subcontracted a portion of its work to DeGroot Heating, Inc., (Heating) which in turn subcontracted with the Powers Regulator Company (Powers). Powers sued the bond surety after failing to receive the compensation due on its contract with Heating.

At trial, Powers contended that the relationship between Edward and Heating was such that Powers was actually a subcontractor of Edward instead of Heating. The trial court rejected Powers' contention, noting that Edward and Heating used different bookkeepers, had separate stockholders and presidents, kept separate business records, maintained separate payrolls, filed separate tax returns, and often submitted separate bids on the same jobs. The court also noted that the two corporations had exchanged correspondence concerning their business transactions and had labor relations contracts with different unions. Based upon these facts, the court concluded that Edward and Heating were separate entities.

Most of the differences that existed between Edward and Heating in *Farina* are not present in this case. Unlike Edward and Heating, Consolidated Utilities and Consolidated Construction employed a single bookkeeper. An accountant prepared a combined financial statement for the two corporations. The corporations maintained a single payroll. Neither company competed with the other for jobs; Consolidated Utilities bid only on contracts requiring a bond while Consolidated Construction bid exclusively on contracts where no bond was required. C. W. Springer was the president, director, and sole shareholder of each corporation. Although Consolidated Utilities purportedly subcontracted with Consolidated Construction on a number of occasions, there is no evidence that the two entities exchanged correspondence or executed written contracts. In addition, both companies had similar names and shared the same office and telephone number. These facts suggest that Consolidated Utilities and Consolidated Construction were, in substance, a single entity.

There are numerous cases where courts have found enough commingling of business and assets so that the legal fiction of corporate separateness should be disregarded, and the corporations have been found to be alter egos.

In *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974), the court acknowledged the Kansas alter ego doctrine:

"Under this doctrine, the corporate entity is disregarded and liability fastened on an individual who uses the corporation merely as an instrumentality to conduct his own personal business. . . . Thus a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity. . . . Circumstances justify disregard of the corporate entity if separation of the two entities has not been maintained and injustice would occur to third parties if the separate entity were recognized."

See *Schmid v. Roehm GmbH*, 544 F. Supp. 272 (D. Kan. 1982); *Farha v. Signal Companies, Inc.*, 216 Kan. 471, 480, 532 P.2d 1330 (1975).

Similarly, the *Schmid* case summarizes Kansas law on the point.

"The fact that two corporations may have stockholders or officers in common or that one is the parent of the other, or that the parent selects from its own directors and officers the majority of the directors of the other, or that a parent finances a subsidiary, is, without more, insufficient to warrant

treating the two corporations as one. 'But where from all the facts and circumstances it is apparent that the relationship between the parent and its subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two so mingled, the recognition of distinct entity would result in injustice to third persons, courts will look through the legal fiction of separate entity and treat them as justice requires.' *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, et al. v. Cardwell Manufacturing Company, Inc.,* 416 F. Supp. 1267, 1286 (D. Kan. 1976)." 544 F. Supp. at 275.

In applying these well-established standards under Kansas law to the facts in this case, we are convinced that the trial court erred in finding that Hall and Consolidated Construction were not in privity. It is abundantly clear to us that Consolidated Utilities and Consolidated Construction were in substance a single entity. Therefore, Vanguard's dealings with Consolidated Construction made Vanguard a supplier to a first tier subcontractor. The district court's conclusion that Vanguard was in too remote of a position to recover under the public works bond does not appear to be supported by substantial competent evidence.

The decision of the trial court is reversed, and the case is remanded with instructions that the trial court enter judgment in favor of Vanguard against American States in an amount determined to be appropriate by the trial judge, plus prejudgment interest at the appropriate rate.

Reversed and remanded.