No. 70,388

DEAN OPERATIONS, INC., *Appellant,* v. ONE SEVENTY ASSOCIATES, a Missouri General Partnership, and DEAN REALTY CO., *Defendants,* and CPI 1986-1, a Missouri General Partnership, and ROGER L. COHEN, EDWARD C. DOERR, DAVID M. LACY, WILLIAM K. STAPP, GREGORY F. CHIRPICH, DON R. MADDUX, TIM SCHAEFFER, THOMAS D. GILLARD, JERRY GRIDER, HARRISON JEDEL, J.R. POPPLEWELL, and JACOB F. MAY, General Partners of CPI 1986-1, *Appellees.*

(896 P.2d 1012)

Opinion filed June 2, 1995.

*James C. Wirken* and *Stephen D. Presser*, of The Wirken Group, P.C., of Kansas City, Missouri, argued the cause, and *Brian F. McCallister*, of the same firm, was with them on the briefs for appellant.

*Leonard Rose*, of Rose, Brouillette & Shapiro, P.C., of Kansas City, Missouri, argued the cause, and *Greer S. Lang*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

LOCKETT, J.: This interlocutory appeal arises from a partnership dispute involving commercial real property located in Wyandotte County, Kansas. Dean Operations, Inc. (Operations), a Missouri corporation, filed a petition to foreclose on a loan it had originally signed as guarantor, and later purchased, on commercial real property owned by One Seventy Associates (the Partnership), a Missouri general partnership comprised of (1) Dean Realty Co. (Realty), a Missouri corporation and wholly owned subsidiary of Operations; and (2) CPI 1986-1 (CPI), a Missouri general partnership. The district court found that Realty was the alter ego of Operations and granted summary judgment to CPI.

The Partnership was formed to construct and lease two office/warehouse buildings in Kansas City, Kansas. The Partnership agreement provided that before the managing partner could issue cash calls for any capital contributions beyond the partners' initial capital contributions, both partners had to consent. Moreover, the managing partner did not have authority to advance funds to the Partnership or be reimbursed by the other partner, even if an advancement was necessary to preserve the Partnership's property.

In April 1987, the Partnership executed a promissory note, mortgage and security agreement, and assignment of leases and rents (the Partnership Loan) to finance the construction of one of the buildings to Blue Valley Federal Savings and Loan Association (Blue Valley). Operations, Realty, and CPI were required to execute separate guaranty agreements to Blue Valley. The building financed by the Partnership Loan and the real estate is the subject of Operations' foreclosure action.

CPI initially managed the Partnership. Because it was either impossible or impractical to obtain the other partner's consent, CPI

resigned as managing partner in April 1989. CPI's resignation was precipitated by financial difficulties related to the Partnership's lack of success in leasing space in the buildings. Realty became the managing partner and issued cash calls on the Partnership. CPI refused to contribute further capital to the Partnership. Realty, as managing partner, contributed in excess of $1 million in additional capital (including CPI's 20% share) for the benefit of the Partnership. In October 1989, Realty filed an action in Missouri for damages against its partner, CPI, to recover CPI's proportionate share of the cash calls and advances.

Blue Valley became insolvent. The Resolution Trust Corporation (RTC) took control of Blue Valley's assets. The RTC sold the Partnership Loan to Community Bank. In February 1991, Operations purchased the Partnership Loan at 85% of its value from Community Bank. Following Operations' acquisition of the Partnership Loan, Realty advised CPI that it would not advance any more funds to the Partnership and that the Partnership Loan would go into default unless CPI paid its share of the cash calls. After CPI refused to pay, the Partnership Loan went into default.

In July 1991, Operations filed an action to foreclose against the Partnership, CPI, and Realty in Wyandotte District Court (the Kansas action). After the foreclosure action was commenced by Operations, Realty requested independent counsel to determine if there was a good faith defense to Operations' foreclosure action. In an effort to obtain an opinion that no defense existed, Realty required that the independent counsel assume no facts existed which would adversely affect the foreclosure of the Partnership Loan. Then, relying on the opinion of independent counsel, Realty advised CPI that, as managing partner, it did not intend to assert a defense to Operations' foreclosure action.

In March 1992, by agreement of the parties, the Missouri action was dismissed without prejudice. Realty's claim against CPI was reasserted as a cross-claim in the Kansas action. In November 1992, the district court ruled as a matter of law that, under the terms of the Partnership agreement, Realty's cross-claim should be denied.

Following Operations' commencement of the Kansas action, CPI brought various counterclaims against Operations, including an ac-

tion for a declaratory judgment to have Operations and Realty declared to be the alter egos of each other. CPI alleged that Operations had used its separate corporate structure to acquire the Partnership Loan, without CPI's knowledge or consent, to evade Realty's fiduciary obligations; to obtain the status of a secured creditor in order to exclude CPI from the Partnership's business and property; to coerce CPI into paying the unauthorized cash calls and advances; and to collect a judgment against CPI's partners for the full amount of the note.

In June 1993, the district court, after examining the nature of the corporate relationship between Operations and Realty, found that Operations was the alter ego of Realty. It then found that recognizing a legal fiction of separateness between Operations and Realty would cause injustice to Realty's partner, CPI. Interpreting Missouri law, the district court held that (1) Operations as the alter ego of Realty had no right to foreclose on the Partnership Loan and (2) Operations was entitled to have its capital account credited by CPI for the amount expended by Operations in acquiring the Partnership Loan. The court also held that Operations' status as a guarantor of the note was of no legal significance because Realty, the alter ego of Operations, was liable as a co-maker of the Partnership Loan and was holding the note and mortgage as constructive trustee for the benefit of the partnership.

The district court made the requisite findings for Operations to apply for an interlocutory appeal pursuant to K.S.A. 60-2102(b) and Supreme Court Rule 4.01 (1994 Kan. Ct. R. Annot. 22). The Court of Appeals granted Operations' application for an interlocutory appeal of the district court's grant of partial summary judgment on the alter ego issue. This court granted Operations' motion to transfer the case from the Court of Appeals pursuant to K.S.A. 20-3017 and Supreme Court Rule 8.02 (1994 Kan. Ct. R. Annot. 46). This court's jurisdiction is premised upon the parties' stipulation that Kansas law is determinative on the alter ego issue.

The underlying cause of the Partnership's financial hardship remains the matter of dispute in the district court action. The issues remaining to be determined in the district court are (1) Operations' claim that CPI failed to obtain tenants for the building and designed

and constructed the wrong type of building to be commercially profitable for the area and (2) CPI's claim that Operations' failure to provide access to the building site made it impossible to obtain tenants.

The parties agreed to submit the alter ego issue to the district court by cross-motions for summary judgment. Prior to oral argument before this court, there was a dispute between the parties as to whether the district court granted partial summary judgment or decided the issues during a bench trial. The parties had exchanged exhibit lists, witness lists, and filed trial briefs prior to the hearing in the district court. Both parties now agree that the finding that Operations was the alter ego of Realty was decided by the district judge during a bench trial.

### Kansas Alter Ego Law

A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. *Land Grant Ry. & T. Co. v. Coffey Co.*, 6 Kan. *245, *253 (1870). Any person, partnership, association, or corporation may incorporate to conduct or promote any lawful business or purpose. K.S.A. 17-6001(a), (b). A corporation holding stock in another corporation stands in the same relation as a stockholder. See *A. T. & S. F. Rld. Co. v. Cochran*, 43 Kan. 225, 234, 23 Pac. 151 (1890).

The concept that one corporation can be found to be the alter ego of another corporation is a well-established doctrine in Kansas law, but examples of its application in a parent-subsidiary corporate context are scarce. Several general principles may be gleaned, however, from prior application by Kansas appellate courts of the doctrine of alter ego in both dissimilar circumstances and in somewhat similar actions brought to pierce the corporate veil and hold individual officers, directors, or stockholders individually responsible for acts knowingly and intentionally done in the name of the corporation. See *Sampson v. Hunt*, 233 Kan. 572, 665 P.2d 743 (1983).

In the absence of fraud or other invidious and vitiating circumstances, the fact that one corporation is instrumental in the formation of another corporation and owns nearly all of the stock of the latter corporation does not have the legal effect of making the parent corporation liable for the debts of the subsidiary corporation. *Continen-*

*tal & C. T. & S. Bank v. Garden City Co.*, 123 Kan. 659, Syl. ¶ 2, 256 Pac. 983 (1927).

The fiction of separate corporate identities of two corporations will not be extended to permit one of the corporations to evade its just obligations; to promote fraud, illegality, or injustice; or to defend crime. Under circumstances where the corporate entity is disregarded, the parent corporation may be held liable for the acts of the subsidiary. The mere fact, however, that a subsidiary corporation was organized for the avowed purpose of avoiding liability on the part of the holding company does not, of itself, constitute fraud justifying disregard of the corporate entity of the subsidiary. The courts will disregard the fiction of a separate legal entity when there is such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for its principal.

The fact that one seeking to recover from a parent corporation under a contract with a subsidiary was aware of the relationship between the two corporations may affect one's right to recover, although, under particular circumstances, such knowledge has been held not a ground for denying recovery.

One Court of Appeals case that illustrates the application of alter ego analysis in a parent-subsidiary corporation context is *Vanguard Products Corp. v. American States Ins. Co.*, 19 Kan. App. 2d 63, 863 P.2d 991 (1993). In determining whether a supplier of materials to a second-tier or sub-subcontractor corporation had a right to recover under a public works bond, the Court of Appeals held that the subcontractor corporation and the second-tier subcontractor corporation were in substance a single entity. The Court of Appeals noted that "appellate courts in Kansas and elsewhere have exhibited a willingness to look beyond the mere surface features of a business relationship where required in the interests of justice and equity." 19 Kan. App. 2d at 67.

The *Vanguard* court reviewed two federal cases, *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir. 1974), and *Schmid v. Roehm GmbH*, 544 F. Supp. 272 (D. Kan. 1982), which discussed Kansas alter ego law. In *Quarles*, the Tenth Circuit Court of Appeals examined an attempt to subject a nonresident parent corporation to

jurisdiction through application of the alter ego doctrine where only the subsidiary corporation had transacted business within Kansas. 504 F.2d at 1362-64. The court noted that a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity. "Circumstances justify disregard of the corporate entity if separation of the two entities has not been maintained and injustice would occur to third parties if the separate entity were recognized." 504 F.2d at 1362. The *Quarles* court found that the totality of the facts supported the trial court's conclusion that the participation of the parent in the affairs of the subsidiary did not amount to a domination of the day-to-day business decisions of the subsidiary and held that under the facts jurisdiction could not be established through application of the alter ego doctrine. 504 F.2d at 1364.

*Schmid v. Roehm GmbH*, 544 F. Supp. 272, was an action to recover damages for injuries sustained as a result of defective safety devices on a gun. In that case, the federal district court considered whether the alter ego doctrine could be applied to impose liability on the parent corporation of the defendant manufacturer. The court observed that the fact that two corporations may have stockholders or officers in common, or that one is the parent of the other, or that the parent selects from its own directors and officers the majority of the directors of the other, or that a parent finances a subsidiary is, without more, insufficient to warrant treating the two corporations as one. It concluded that from all the facts and circumstances, where it is apparent that the relationship between the parent and its subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two so mingled, that the recognition of distinct entity would result in injustice to third persons, courts will look through the legal fiction of separate entity and treat them as justice requires. 544 F. Supp. at 275. See *Intern. U., United Auto., Etc. v. Cardwell Mfg. Co.,* 416 F. Supp. 1267, 1286 (D. Kan. 1976).

Noting that the determination of whether a subsidiary corporation is an instrumentality of the parent is a question of fact, the *Schmid* court noted that *Cardwell* had set out 10 factors, established by *Fish*

*v. East*, 114 F.2d 177, 191 (10th Cir. 1940), as guidelines in making a determination of alter ego status. The 10 factors are: (1) whether the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) whether the corporations have common directors or officers; (3) whether the parent corporation finances the subsidiary; (4) whether the parent corporation subscribed to all of the capital stock of the subsidiary or otherwise causes its incorporation; (5) whether the subsidiary has grossly inadequate capital; (6) whether the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) whether the subsidiary has substantially no business except with the parent corporation, or no assets except those conveyed to it by the parent corporation; (8) whether in the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division; (9) whether the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and (10) whether the formal legal requirements of the subsidiary as a separate and independent corporation are not observed. *Schmid*, 544 F. Supp. at 275. The *Schmid* court noted that although plaintiffs had established only a few of the 10 factors, the plaintiff had failed to establish that the use of the separate corporate structure resulted in any fraud or inequitable conduct (or injustice) towards the plaintiff. 544 F. Supp. at 276-77.

Although the Kansas Court of Appeals had previously approved use of the 10 factors set out in *Cardwell* in determining whether the alter ego doctrine applied in a parent-subsidiary context in *Service Iron Foundry, Inc. v. M. A. Bell Co.*, 2 Kan. App. 2d 662, 588 P.2d 463 (1978), the *Vanguard* court did not cite that case as authority. In *Service Iron Foundry, Inc.*, the Court of Appeals discussed the 10 factors and found that no single factor is necessarily conclusive in determining whether to apply the alter ego doctrine. 2 Kan. App. 2d at 674. The *Vanguard* court instead applied the standards set out in the two federal cases, found that the two corporations were in substance a single corporation, and reversed the district court.

Seven years after *Cardwell*, the United States District Court for the District of Kansas decided *Hoffman v. United Telecommunications, Inc.*, 575 F. Supp. 1463 (D. Kan. 1983). *Hoffman* was an em-

ployment discrimination action against a parent corporation and 38 subsidiaries located throughout the country. In ruling on the subsidiaries' motion to dismiss for lack of jurisdiction over the parent corporation, the district court held, among other things, that the parent corporation exerted such dominion and control over its subsidiaries they were not separate and distinct corporate entities, but one and the same under alter ego analysis. The *Hoffman* court adopted the 10 factors as set out in *Cardwell.* 575 F. Supp. at 1478; see *Intern. U., United Auto., Etc. v. Cardwell Mfg. Co.*, 416 F. Supp. at 1286.

## Standard of Review

When a district court has made findings of fact and conclusions of law, the function of the appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. In reviewing the district court's decision, the appellate court must accept as true the evidence and all inferences to be drawn therefrom supporting the trial court's findings, disregarding any conflicting evidence or other inferences to be drawn therefrom, and the district court's findings of fact should not be set aside unless clearly erroneous. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377-78, 855 P.2d 929 (1993). The district court reviewed the affidavits of the parties' respective experts, the nature of the corporate structures of Operations and Realty, the uncontroverted facts stated by CPI, and the interactions between the two corporations in their course of doing business.

The district court found that there was evidence that 8 of the 10 factors enumerated in *Hoffman* had been shown. The district court noted that Operations conceded the parent company owned all or a majority of the subsidiary, the parent and subsidiary have common directors and officers, the parent finances the subsidiary, and the parent subscribes to all stock of the subsidiary. The district court also found from the evidence that without significant contributions by Operations, Realty would be grossly inadequate in capital; that Operations pays the expenses of Realty; and that the major decisions affecting Realty and its management are made by the officers and directors of Operations, who consider Realty as a department or

division. The court concluded that Operations and Realty were alter egos, acting as one corporation.

Operations does not challenge the district court's conclusion that it owns all or a majority of the capital stock of Realty, that the corporations have common directors or officers, and that it subscribed to all of the capital stock of Realty. Operations does challenge the court's finding that Operations finances Realty, that Realty has inadequate capital, that Operations pays the salaries and losses of Realty, that Operations does not treat Realty as a separate corporation, and that the directors or executives of Realty do not act independently in the interest of Realty but take direction from Operations.

Both parties rely heavily on the affidavits of their respective experts as they analyze the uncontroverted facts of the corporate structures of Operations and Realty and the interactions between the two in several areas in the course of doing business. The district court stated that while great attention was given to the analysis of each expert, both of whom were CPA's, no weight was given to the opinion of either on the ultimate issue, which is legal in nature and outside their expertise. The district court adopted most of the findings of the defendant's expert and found that in certain areas the analysis of John L. Clymer, the plaintiff's expert, was not credible.

### (1) Realty's Financing

The district court found that without substantial payments from Operations to Realty, its subsidiary, Realty would not have been able to survive. It noted that in every year except one since 1983, Operations made cash advances to Realty so that it could pay its obligations and meet its operating needs. From 1983 through 1991, Operations' cash advances to Realty totaled over $11 million and represented 18-22% of Realty's financing needs. Operations' December 31, 1991, balance sheet (without subsidiaries) and Realty's December 31, 1991, audit report, both of which were audited by Clymer's accounting firm, classified these advances as long-term debt.

While Realty was able to obtain 78-96% of its financing from unrelated parties, that debt was guaranteed by Operations. CPI's expert testified that, considering Realty's history of sustaining huge losses, Operations' guaranty of all of Realty's borrowing from third parties

indicated that Operations' guaranty was an essential consideration in Realty's ability to borrow from third parties. After Operations converted $4 million of inter-company debt to permanent capital in 1991 to enable Realty to obtain needed financing from unrelated parties, Realty was still unable to obtain financing without Operations' guaranty.

### (2) Realty's Capital

The district court found that without significant contributions by Operations, Realty would be grossly inadequate in capital. The record reveals that, although Realty was able to meet its obligations each year as they matured, it could not have paid its debts but for the infusion of funds from Operations, an amount in excess of $11 million since 1983.

### (3) Realty's Salaries, Expenses, and Losses

The district court found that whether Operations pays expenses of Realty was subject to interpretation based upon the record and the respective reports of the parties' experts. The court concluded that when viewed in totality, it was clear that the salaries, expenses, and losses of Realty were in substantial part paid by Operations.

### (4) Operations' View of Realty

The district court found that the record was replete with evidence that Operations considered Realty a department or division. The court referred to the minutes of several of Operations' directors meetings in which Realty was referred to as the "investment side" as opposed to the "machinery side." The record revealed that Operations commonly referred to Realty as "Investments," the "Investments Group," "Financial/Investments," "Investments Division," the "Investments side of the house," the "Investments side," the "Investments Portion," the "Real Estate side," the "Realty level," a "department," a "subsidiary," a part of the "Dean Companies," a member of the "Dean Operations Group," and a "member of the group." The trial court's conclusion is further supported by evidence that, prior to the acquisition of the Partnership Loan, Operations considered itself a partner, or at least more than a mere guarantor.

On appeal, we do not weigh conflicting testimony. We have reviewed each of the contested factors and find there is substantial competent evidence to support the district court's conclusions that (1) Realty was financed by Operations; (2) Realty was inadequately capitalized; (3) Operations paid the salaries, expenses, and losses of Realty; and (4) Operations considered Realty as a subsidiary.

### Injustice to CPI

In addition to concluding that some of the 10 factors for determining alter ego status exist, it must be shown that allowing the legal fiction of separateness of the corporate structures results in an injustice. The corporate entity may be disregarded where it is used as a mere subterfuge, as an implement for fraud or illegality, or to work an injustice, or where necessary to achieve equity. *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 796, 473 P.2d 33 (1970).

Operations contends that the district court erroneously concluded that allowing the legal fiction of separateness between the parent and subsidiary corporations would result in injustice to CPI. The district court observed that the *Hoffman* factors were only aids in determining the issue of alter ego. It acknowledged the ultimate test for applying the theory of alter ego:

" '[W]here from all of the facts and circumstances it is apparent that the relationship between the parent and subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two so mingled, that recognition of the distinct entity would result in an injustice to third-party persons, courts will look through the legal fiction of separate entity and treat them as justice requires' " (quoting *Hoffman*, 575 F. Supp. at 1478).

After finding that 8 of the 10 factors applied and concluding that Operations and Realty were acting as one corporation, the district court acknowledged that to disregard the separate corporation and apply the alter ego theory, there must be an injustice to CPI. The district court found that Operations had been unjust in two specific instances: First, when Operations became the secured creditor of the Partnership, it unjustly used its position of a secured creditor to circumvent the partnership agreement. Second, Operations established a condition that CPI pay its 20% of the discounted loan in cash and

required CPI to pay all prior unapproved cash calls, which it was not legally responsible to do.

Operations argued that purchasing the note was a sound business judgment which did not cause CPI to incur additional liability. The court disagreed with this argument, pointing out that as a result of Operations' acquisition of the note and mortgage, Operations became the secured creditor of the Partnership. The court noted that as the secured creditor, Operations set various conditions for its subsidiary corporation, Realty, and the subsidiary's partner, CPI, to participate in the discounted value of the loan as an alternative to being responsible for the full face amount of the loan. To participate further in the project, Operations required CPI to pay its 20% of the discounted loan in cash and all prior unapproved cash calls. The court concluded that this requirement by the parent corporation was a condition which could not be imposed under CPI's partnership agreement with Operations' subsidiary corporation.

### Operations' Argument

Operations asserts that in order to meet the requisite criteria of injustice, "the behavior of the shareholder, whom the party seeking to pierce desires to reach, must be reprehensible conduct; it must be something more than a reasonable business judgment made to limit risk." Operations claims that protecting its status as a guarantor of the Partnership Loan was an exercise of sound business judgment. Operations concludes that its offer to share the benefits of the discounted purchase price of the Partnership Loan with CPI was a benefit of the partnership.

Operations admits that foreclosure was made possible when its subsidiary, Realty, stopped making payments on the Partnership Loan. It asserts that Realty was not obligated under the partnership agreement to perpetually expend its resources while CPI refused to meet cash calls and gave no sign of making additional needed financial contributions. Operations asserts that Realty had sound business reasons to cease making payments on the Loan. It concludes that it was not equitable for the partnership to stop making the loan payments merely because Operations, the parent corporation of one of the partners, had purchased the note and mortgage. Operations con-

cluded that the district judge's decision allowing CPI to prevent foreclosure, after CPI benefitted from Operations' guaranty of the loan, results in an injustice.

## CPI's Argument

CPI argues that Operations used its separate identity so Realty could evade its fiduciary obligations to its partner, CPI. Under these circumstances, there was sufficient reason for the district court to apply the alter ego theory. Specifically, CPI asserts that the requisite injustice to apply the theory occurred when Operations and Realty conspired and concocted a plan employing their separate corporate structures. Under the plan, Realty agreed that Operations was to acquire the Partnership Loan without CPI's knowledge or consent and then either exclude CPI from the Partnership's business and property or force CPI to pay the unauthorized cash calls. CPI argues that this scheme would allow Realty to evade its fiduciary obligations to its partner. CPI points out that Operations and Realty used Operations' status as a secured creditor to threaten to immediately foreclose and impose CPI's partners with personal liability for the full face amount of the Partnership Loan unless CPI acquiesced and paid the unauthorized cash calls and advances by Realty.

In support of its argument that Operations and Realty combined together to breach a fiduciary duty, CPI cites *Kunz v. Huddleston*, 546 S.W.2d 685 (Tex. Civ. App. 1977). In *Kunz*, two partners, Kunz and Huddleston, entered into a partnership agreement to purchase, construct, and manage certain shopping centers. The partners then procured a construction loan secured by a deed of trust. The partners' respective interpretations of the partnership agreement precipitated a dispute over the amount billed by a construction corporation in which Kunz was president and majority stockholder. Without notice to Huddleston, Kunz' construction corporation purchased the partnership's loan and the deed of trust and initiated foreclosure proceedings against the partnership. Huddleston subsequently filed suit for injunctive relief, for dissolution of the partnership, for an accounting, and for damages. The jury determined that Kunz had breached his fiduciary duty owed to Huddleston and assessed damages against Kunz.

On appeal, Kunz argued that there was no evidence that he and the corporation constituted a single entity, that the corporation was not a sham, and that it was error for the jury to disregard the corporate fiction and to pierce the corporate veil. The Texas Court of Civil Appeals, despite observing that strained personal relations undoubtedly existed between the partners and that Kunz was merely attempting to protect his corporation and himself, affirmed the decision of the trial court. Noting that Kunz had admitted that he was responsible for all decisions made by the corporation and that Kunz' liability was based on principles of agency and not because he was the controlling shareholder of the corporation whose veil was pierced, the court stated:

"But if justification for the name calling of 'piercing the veil' be required, that can readily be found in the facts of this case. The corporate structure was used by Kunz to avoid his existing legal obligation as a fiduciary, as required by the partnership and as called for under the partnership statute. [Citations omitted.] Kunz could not be permitted to avoid his fiduciary duty by use of this corporation." 546 S.W.2d at 689.

Both parties in this case cited to the district court Missouri case law as to the confidential and fiduciary relation between partners and its resulting obligations. Operations asserts that the district court improperly relied on *Ebest v. Bruce*, 734 S.W.2d 915 (Mo. App. 1987); and *Thomas v. Schmelzer*, 118 Idaho 353, 796 P.2d 1026 (Ct. App. 1990). Operations asserts that both cases are inapplicable to the facts in this case because neither case involved corporate alter ego law. We disagree with Operations' assertion.

In *Ebest v. Bruce*, the general partners of a limited partnership purchased loans of the limited partnership at a substantial discount. This denied the partnership the right of first refusal and the value of the discount. The limited partners sued the general partners for breach of their fiduciary duty. The circuit court found no breach of fiduciary duty, but held that the general partners could not retain the beneficial interest in the financing and ordered that they transfer the notes to the partnership in exchange for compensation equal to their cost. On appeal, the Missouri Court of Appeals reviewed Missouri statutory law relating to partnerships. The court rejected the general partners' argument that they had not breached their fiduciary duty because the partnership owed the same amount of money after

they purchased the loans as before, noting that the partnership would have benefitted from a "good deal" had it purchased the notes. The court emphasized that the defendants realized a personal gain which belonged to the partnership. It held that the general partners breached their fiduciary duty to the corporation. 734 S.W.2d at 922.

In *Thomas v. Schmelzer*, two couples formed a partnership for the purpose of purchasing, managing, and renting real property. The partnership was eventually dissolved by agreement. Following the dissolution of the partnership, two partners, without notice to the defendant partners, purchased three contracts which the partnership had executed, thereby becoming a secured creditor of the partnership. The two partners eventually brought an action against the defendant partners for an accounting, and the defendant partners counterclaimed for breach of fiduciary duty and misappropriation of assets. The district court entered judgment, finding, *inter alia*, that the partners' purchase of the contracts was not a breach of fiduciary duty. On appeal, the Idaho Court of Appeals held the district court erred as a matter of law, stating:

"Through their undisclosed act, the Thomases obtained an advantage over their partner by stepping into the shoes of a secured creditor. We reject the finding that this act did no economic harm to the partnership or the [defendant partners]. At least the [defendant partners] suffered because they were being subject to demands for immediate payment of the contract indebtedness plus attorney fees as sought by the [plaintiff partners] in the notice of default. We hold that the [plaintiff partners'] purchase . . . and the concealment of it during the [settlement agreement] negotiations, was a breach of their fiduciary duties to account and to render full information." 118 Idaho at 359.

There is substantial evidence that Realty and Operations acted in concert without CPI's knowledge when officers of both the parent and subsidiary corporations negotiated and purchased the Partnership Loan. During the negotiations, Realty and Operations were aware of the advantage that Operations as a secured creditor would have over Realty's partner, CPI. Operations' officers stated to the holder of the note that it was capable of rendering the Partnership Loan non-recourse if the holder of the note refused to allow Operations to purchase the Partnership Loan. Once Operations purchased the Partnership Loan at a discounted rate, it unjustly used its position

as a secured creditor to circumvent the partnership agreement between Realty and CPI and place additional requirements on CPI.

Affirmed.