Jason Eric **CUIKSA**, Plaintiff,

v.

**HALLMARK HALL OF FAME PRO-DUCTIONS, INC., and McGee Street Productions, Inc. Defendants.**

No. 00–1389–JAR.

United States District Court,
D. Kansas.

March 14, 2003.

Troy H. Gott, Gary E. Patterson, Patterson, Gott & Graybill, Wichita, KS, John P. Sheehy, Michael C. Snyder, Meshbesher & Spence, Ltd., Minneapolis, MN, for plaintiff.

Philip R. Dupont, Ronald D. Marney, II, Husch & Eppenberger, LLC, Kansas City, MO, Michael J. Mohlman, Sly James Firm, Trial Lawyers, PC, Kansas City, MO, Kirsten Roth, Blackwell Sanders Peper Martin LLP, Two, Kansas City, MO, for defendants.

### MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTION(S) FOR SUMMARY JUDGMENT

ROBINSON, District Judge.

This matter is before the court on defendants' McGee Street Productions, Inc. ("McGee") and Hallmark Hall of Fame Productions, Inc. ("Hallmark") Motion(s) for Summary Judgment (Docs. 117 and 116), brought pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Plaintiff has filed a response (Doc. 129) and defendants have filed replies to plaintiff's response (Docs. 138 and 139). Additionally, plaintiff filed a Surreply including a Motion To Strike New Issue raised by defendants in their reply memorandums (Doc. 142) and defendants filed Motions to Strike the Surreply of plaintiff, or in the alternative, responses to plaintiff's Surreply (Docs. 143 and 145). Finally, plaintiff filed a motion to consider new evidence (Doc. 147). Plaintiff's complaint alleges claims of negligence against both McGee and Hallmark.

### I. BACKGROUND

The following facts concerning plaintiff's claims are either uncontroverted or, if controverted, are construed in the light most favorable to plaintiff.

McGee is a wholly owned subsidiary of Hallmark, established for the production of Hallmark movies. McGee is incorporated and has its principal place of business in California. Hallmark is a Delaware corporation, with its principal place of business in Missouri. Plaintiff is a resident of Kansas. All incidents relevant to plaintiff's claim occurred in Osage County, Kansas.

McGee contracted with Hallmark in January of 1998 to produce Sarah Plain and Tall: Winters End ("Sarah III"). McGee

came to Osage County, Kansas in February of 1999 to film Sarah III. McGee contracted with a local land owner for the use of his property during the period of filming. (Pl.Ex. 3). D & D Equipment & Sales, Inc. ("D & D") rented, sold and leased heavy equipment. McGee contracted with D & D for the use of its equipment during the production of Sarah III. The contract between McGee and D & D included repair and replacement services. Plaintiff was employed by D & D when the events giving rise to this action occurred.

One piece of equipment supplied by D & D, the Condor telescoping manlift ("Condor"), malfunctioned on April 16, 1999. An unknown person on the set of Sarah III hot-wired the Condor and moved it off to the side of the road. At the time the Condor was hot-wired, no D & D employees were on the production set of Sarah III. The unknown person parked the Condor adjacent to or partially beneath a high voltage (11,000 volts), uninsulated power line so that the Condor was within 27 feet of the power line, while unextended. The transportation department and the electric department on the production set decided to park the Condor at this location because it was a "safe place to park it out of harm's way." (Pl.Ex. 19, p. 32, 1–12). A parking lot was available, but did not have enough room to park the Condor. Steve Pape, a supervisor on the McGee set, knew the Condor was parked adjacent to the power lines.

McGee contacted D & D to advise them that unless D & D could replace or repair the Condor by the following morning, McGee would seek out another machine. That evening, D & D sent plaintiff and Kelly Brown ("Brown") to the movie set in Osage County, to repair the Condor. When plaintiff and Brown arrived at the set, a "flagger" stopped them at the entrance and had them wait for a disputed period of time, to allow for a break in filming. The "flagger" told Brown and plaintiff to use only their parking lights in traveling to the site of the Condor so as not to interfere with the filming. By this time, it was dark outside.

When Brown and plaintiff inspected the Condor, they found that it did not need repair. There was a simple reason why McGee employees could not keep the Condor running; someone had flipped the safety-kill switch. So, Brown reset the switch and asked plaintiff to "load the hydraulics" to make sure it worked properly. Deposition testimony revealed that to "load the hydraulics" means to test the movement of the machine up, down and from side to side. When plaintiff raised the bucket to test its functions, he came in contact with the uninsulated, high voltage power lines and was electrocuted. Plaintiff suffered severe burns and the amputation of both hands.

No one on the McGee set had warned plaintiff or Brown that the Condor was parked under or adjacent to the power lines. Both plaintiff and Brown testified that the lines were not visible against the night sky. Brown testified that he asked someone on the McGee lot, whose identity is disputed, whether there were any obstructions they should be aware of and was advised that there were none.

Any pertinent facts relating to the relationship between Hallmark and McGee will be included in Section IV below.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[1] There

---

1. Fed.R.Civ.P. 56(c).

is a "genuine" issue of material fact if a reasonable jury could return a verdict for the nonmoving party.[2] Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[3]

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. This may be met by showing that there is a lack of evidence to support the nonmoving party's case.[4] Once the moving party properly supports its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.[5] "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."[6] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.[7] The Court must consider the record in the light most favorable to the nonmoving party.[8]

## III. DISCUSSION

Because each defendant argues for summary judgment based on different theories, the defendants' motions will be taken in turn.[9]

### A. Defendant McGee's Motion for Summary Judgment

■ McGee seeks summary judgment based on the exclusive remedy provision of the Kansas Workers' Compensation Act ("KWCA").[10] McGee also argues that it owed no duty to plaintiff under the rule set out in *Dillard v. Strecker*.[11] These arguments are inextricably entwined as much of *Dillard's* analysis relies on the exclusive remedy provision of the KWCA and the policy behind that statute.

Kansas law provides that an employee may not recover twice from an employer for an injury that is covered by workers' compensation.

> Except as provided in the workers compensation act, no employer, or other employee of such employer, shall be liable for any injury for which compensation is recoverable under the workers compensation act nor shall an employer be liable to any third party for any injury or death of an employee which was caused under circumstances creating a legal liability against a third party and for which workers compensation is payable by such employer.[12]

■ The exclusive remedy provision protects both employers and employees. Employees are guaranteed a form of recovery against their employer; and employers are protected against paying for the employees damages twice—once

---

**2.** See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**3.** *Id.* at 251–52, 106 S.Ct. 2505.

**4.** See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**5.** See *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

**6.** *Id.*

**7.** See *id.*

**8.** *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984).

**9.** Hallmark's motion includes a footnote stating that if its motion is denied, it joins in McGee's motion.

**10.** Kan. Stat. Ann. § 44–501 (1993).

**11.** 255 Kan. 704, 877 P.2d 371 (1994).

**12.** Kan. Stat. Ann. 44–501(b).

through workers' compensation and again through a civil action for damages. "The provisions of the Act are to be liberally construed for the purpose of bringing a worker under the Act whether or not desirable for the specific individual's circumstances." [13]

■■■ The Act extends to those employers who may not be the immediate employers of the injured party. The purpose of K.S.A. 44–503(a) is "to prevent employers from evading liability under the act by the device of contracting with outsiders to do work which they have undertaken to do as part of their trade or business." [14]

Where any person (in this section referred to as principal) undertakes to execute any work *which is a part of the principal's trade or business or which the principal has contracted to perform and contracts with any other person* (in this section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any worker employed in the execution of the work any compensation under the workers compensation act which the principal would have been liable to pay if that worker had been immediately employed by the principal; and where compensation is claimed from or proceedings are taken against the principal, then in the application of the workers compensation act, references to the principal shall be substituted for references to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the worker under the employer by whom the worker is immediately employed. For the purposes of this subsection, a worker shall not include an individual who is a self-employed subcontractor. [15]

■■■ McGee argues that under the above statute, often referred to as the multi-employer doctrine, they are not liable in tort to plaintiff because they were liable to plaintiff under the KWCA. The policy behind extending the exclusive remedy bar to other than the general employer assumes that those who contract with plaintiff's general employer have already incurred the costs of providing workers' compensation coverage through the price of the contract. These employers are referred to as "special employers."

■■■ The KWCA does not define "special employers" or "special employees"; however, a litany of case law provides an adequate explanation. Kansas has adopted the test set out in Larson's Workmen's Compensation Law: [16]

When a general employer lends an employee to a special employer, the special employer becomes liable for workmens' compensation only if

(a) The employee has made a contract for hire, express or implied, with the special employer;

(b) The work being done is essentially that of the special employer; and

(c) The special employer has the right to control the details of the work. [17]

If the employment relationship meets the above test and he is found to be a lent-

---

13. *Zehring v. Wickham*, 232 Kan. 704, 658 P.2d 1004, 1008 (1983).

14. *Bright v. Cargill, Inc.*, 251 Kan. 387, 837 P.2d 348, 356 (1992) (citations omitted).

15. Kan. Stat. Ann. 44–503(a) (1993) (emphasis added).

16. Larson's Workmen's Compensation law, 1966, Volume 1A, § 48.00, p. 710.

17. *Id.; Bendure v. Great Lakes Pipe Line Co.*, 199 Kan. 696, 433 P.2d 558 (1967).

employee, the employer is a special employer and protected by the exclusive remedy bar of the KWCA. If the test is not met, the following statute of the KWCA applies:

> When the injury or death for which compensation is payable under the workers' compensation act was caused under circumstances creating a legal liability against some person *other than the employer* or any person in the same employ to pay damages, the injured worker or the worker's dependents or personal representatives shall have the right to take compensation under the workers compensation act and pursue a remedy by proper action in a court of competent jurisdiction against such other person.[18]

### 1. Contract for Hire

As to the first element of the test, the contract between McGee and D & D provided not only for the use of the equipment, but also repair services. The question is whether a contract, express or implied, existed between plaintiff and McGee. An express contract is not present; however, actions of the parties can create an implied contract.

A key factor in determining whether an implied contract exists, is whether plaintiff consented to control by McGee.[19] Generally, courts have found an implied contract through control by the special employer and consent of the special employee in cases where the plaintiff worked for a temporary employment agency. In those instances, the plaintiff is assumed to consent to the direction and control of the special employer by the very nature of his job. The employees are assigned by a temporary agency to an employer for work

to be controlled and directed by the special employer. The general employer, in this scenario the temporary agency, does not direct or control the work that those plaintiffs would do on the job site. Other examples involve instances where goods are being delivered and part of the contract, express or implied, involves the loading or unloading of goods. In those instances, when the goods are loaded and unloaded on the job site, the employee of the general employer will take direction and submit to control from the special employer during the unloading process.[20]

McGee called D & D to send someone to the production set to repair the Condor. D & D sent plaintiff. Thus, plaintiff's orders to go to the site were from his general employer. The question remains whether he consented to an employment relationship with McGee. When plaintiff arrived on the set, McGee had him wait a period of time before directing him to the site of the Condor. However, McGee's employees did not advise him how to fix the Condor. Plaintiff was there to work on equipment belonging to D & D, which was leased to McGee.

McGee has not shown that it assumed control of the work of plaintiff or that plaintiff consented to that control. "Where reasonable minds could differ, the determination of whether loaned employees become the employees of the borrower was left to the trier of fact."[21] Reasonable minds could differ over whether an implied contract existed between plaintiff and McGee. Was McGee directing and controlling the work of plaintiff once he arrived at the set or was plaintiff merely carrying out the orders of his general em-

**18.** Kan. Stat. Ann. § 44–504(a) (1993) (emphasis added).

**19.** *Hardman v. Specialty Services,* 177 F.3d 921, 925 (10th Cir.1999) (citations and internal quotations omitted).

**20.** *Bright v. Bragg,* 175 Kan. 404, 264 P.2d 494 (1953).

**21.** *Corley v. Hardaway Co. et al,* 905 F.Supp. 923, 932 (D.Kan.1995).

ployer, D & D, to repair the Condor?.[22] Because McGee cannot show that this is not a genuine issue of material fact, summary judgment must be denied.

### 2. Whose Work is Being Done?

■ To qualify as a special employer, the work the plaintiff was doing must have been the work of McGee. It seems evident that a question of fact remains as to whose work plaintiff was doing. He was sent to the movie set by his general employer, D & D. The equipment he was repairing was that of D & D. The facts lend themselves to the inference that McGee was unable to complete the repair. They admit that the equipment malfunctioned and that they had to hot-wire the machine to move it out of their way. K.S.A. § 44–503(a) refers to work that is part of the principal's trade or business. In making this inquiry, courts look to 1) whether the "work being performed by the ... injured employee [was] necessarily inherent in and an integral part of the principal's trade or business," and 2) whether "the work being performed by the injured employee such as would ordinarily have been done by the employees of the principal."[23]

In applying these questions to individual cases, Kansas has adopted language from Larson's treatise, referred to as the *Hanna*[24] test.

> The test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, af-

ter all, this could be said of practically any repair, construction or transportation service. The test ... is whether this indispensable activity is, in that business, normally carried on through employees rather than independent contractors.[25]

From a simple application of the *Hanna* test to the case at bar, McGee has not shown that repairing heavy equipment like the Condor is an essential and integral part of its business of making movies for Hallmark. The mere fact that the equipment had to be leased from D & D implies that McGee did not possess such equipment and the need to have a D & D employee come out to do something as simple as flip a kill switch certainly implies that fixing equipment is not part of McGee's trade or business.

Further, the second, and nearly overlapping, prong of the *Hanna* test seems equally as obvious. If this were work that McGee employees would normally perform, why the need to wait hours and risk not having the necessary equipment to film to have someone drive from more than two hours away to merely flip a kill switch to reset the machine?

McGee has not shown as a matter of law that no material issue of fact exists. They have shown nothing to suggest that film making companies like McGee normally own, operate and repair heavy equipment.[26] In fact, the very actions of McGee and its employees create the issue of fact.

---

**22.** *Id.* (citing 1B Larson's Workmen's Compensation Law § 48.15 (1994)) ("But what seems on the surface to be such acceptance may actually be only a continued obedience of the general employer's commands.")

**23.** *Cargill, Inc.,* 251 Kan. 387, 837 P.2d 348.

**24.** *Hanna v. CRA, Inc.,* 196 Kan. 156, 409 P.2d 786 (1966).

**25.** *Id.* (citing 1C Larson, Workmen's Compensation Law § 49.16(j), p. 9–105–106 (1991)).

**26.** *Martin v. Mapco Ammonia Pipeline, Inc.,* No. CIV–A. 93–2218–GTV, 1994 WL 409591 (D.Kan. July 27, 1994).

### 3. Who Controlled the Details of Plaintiff's Work

■ The final element of the lent employee doctrine, and probably the most crucial as it generally weighs on the other two factors, is who controlled the plaintiff's work. Some factors courts look at are who controlled "where, when and how the work was to be performed and also at whether the employer could discharge the employee for unsatisfactory performance."[27]

Many of the cases that find control by a special employer involve temporary employment agencies where although the special employer does not directly pay the employee, he does control the details of the work done at the job site. Further, in those cases, the general employer does not continue to exercise any control over the lent employee once he is assigned to the job site. Here, the facts are substantially different.

Larson's treatise gives a guiding example of analyzing control over an employee. "If, however, the general employer merely arranges for labor without heavy equipment, the majority of the cases hold that the worker becomes the employee of the special employer ...."[28]

Larson's example sheds light on the facts at hand. Plaintiff in this case was not an employee of a temporary employment agency who was assigned to McGee. Further, the work plaintiff was conducting at the movie set was on equipment that belonged to D & D. It would be a stretch to say that McGee controlled how the work was to be performed when McGee's own employees could not discover that there was no malfunction; the Condor was not running because someone had turned on the safety kill switch. In fact, deposition testimony of defendant's employees implies a hands-off approach to dealing with the plaintiff at the site—suggesting they barely spoke to him and told him essentially nothing about the Condor or its location. Additionally, nothing in the parties' pleadings suggest that McGee had any authority to discharge plaintiff for unsatisfactory performance. Finally, plaintiff was ordered to the movie set by D & D, not by McGee.

Furthermore, the Court finds no merit in McGee's argument that under the rule set out in *Dillard* they owe no duty to plaintiff and thus cannot be liable for his injuries. *Dillard* was specifically limited to the claims and facts of that case by the court;[29] and the claims and facts in this case are different. In *Dillard*, the Catholic Archdiocese of Kansas City contracted with A.L. Huber for construction work, who in turn subcontracted with P & S for the masonry work. During construction, a masonry wall collapsed on the plaintiff, causing severe injuries. Plaintiff, an employee of the subcontractor, P & S Masonry, brought a negligence action against the general contractor, the Catholic Archdiocese. Plaintiff alleged that the church had a statutory, nondelegable duty to inspect the masonry wall and that by breaching that duty, the church was liable to plaintiff for his resulting injuries. Plaintiff also alleged that the church was vicariously liable for the subcontractor's negligence because he was performing an inherently dangerous activity. The church asserted the defense of the exclusive remedy provision of the workmens' compensation act. The *Dillard* court held:

(1) A landowner is not liable to an employee of an independent contractor covered by workers compensation for injury

---

**27.** *Hardman,* 177 F.3d at 925.

**28.** 3 Larson's Workers' Compensation Law § 67.05.

**29.** *Dillard,* 877 P.2d at 386.

sustained as a result of the breach of a nondelegable duty imposed upon the landowner by statute or ordinance.

. . . . .

(2) Our decision is limited to the facts herein and to those instances where the injured employee of an independent contractor covered by workers compensation seeks to hold a landowner liable under the theories discussed in the opinion.[30]

Given this limitation by the court, and the interpretation of that limitation by this court, the rule announced in *Dillard* does not extend to the facts and claims of this case. Shortly after the *Dillard* decision, this court decided *Martin v. Mapco Ammonia Pipeline, Inc.*, a case that similarly involved a contractor-subcontractor relationship.[31] In *Martin*, plaintiff brought claims based on the negligence of the landowner, and the court rejected the application of the *Dillard* rule to shield the landowner from liability. The theories propounded in *Dillard* are based on the negligence of the contractor or sub-contractor and seek to impose liability vicariously, through exceptions to the workers' compensation bar. D & D is the subcontractor and general employer of plaintiff in the case at hand. Plaintiff's claims involve the negligence of McGee, not that of D & D. *Dillard* does not shield a defendant from his own negligence and cases cited in the *Dillard* decision confirm the court's decision to limit the holding to claims regarding the negligence of the sub-contractor.[32]

### B. Hallmark's Motion for Summary Judgment

Hallmark makes its motion for summary judgment on two grounds: 1) that it was not in control of the movie set and thus cannot be liable; and 2) that McGee was not Hallmark's alter ego and it was not in a joint venture with McGee, and thus cannot be liable. Again, the burden is first on defendants to show that no material issue of fact exists and that they are entitled to judgment as a matter of law. Only then does the burden shift to plaintiff to overcome this proof and show genuine issues of material fact.

### 1. Alter Ego

The concept of "alter ego" is a well established doctrine in Kansas. Kansas courts use ten factors when evaluating alter ego status:

(1) whether the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) whether the corporations have common directors or officers; (3) whether the parent corporation finances the subsidiary; (4) whether the parent corporation subscribed to all of the capital stock of the subsidiary or other wise causes its incorporation; (5) whether the subsidiary has grossly inadequate capital; (6) whether the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) whether the subsidiary has substantially no business except with the parent corporation; (8) whether in the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division; (9) whether the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and (10) whether the formal legal requirements of the subsid-

---

**30.** *Dillard*, 877 P.2d at 385–83.

**31.** 1994 WL 409591.

**32.** *See id* at *7 (citing *Tauscher v. Puget Sound Power & Light Co.*, 96 Wash.2d 274, 635 P.2d 426, 430 (1981); *Stockwell v. Parker Drilling Co., Inc.* 733 P.2d 1029, 1032 (Wyo.1987)).

iary as a separate and independent corporation are not observed.[33]

■ No single factor is conclusive in determining alter ego status.[34] While these factors guide the Court or trier of fact in deciding the corporations' status, the ultimate test in determining alter ego is:

> [W]hether, from all of the facts and circumstances, it is apparent that the relationship between the parent and subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two are so mingled that recognition of the subsidiary as a distinct entity would result in an injustice to third parties.[35]

Plaintiff in this case must not only show the corporate structure is of one corporation and not two separate legal entities, but he also must show an injustice to him by the legal fiction of two corporate entities.[36]

### a. Does Hallmark own all or a majority of the capital stock of McGee?

Hallmark does not dispute that it is the sole shareholder of all stock in McGee.[37] Hallmark is correct in noting that the fact that McGee is a wholly owned subsidiary of Hallmark does not mean they are not distinct and separate legal entities;[38] however, it is evidence of one of the ten factors to be weighed.

### b. Do Hallmark and McGee have common directors or officers?

The president of McGee is also the president of Hallmark.[39] The only director of McGee is the vice-president of Hallmark and the vice-president of McGee.[40] Testimony of both the president and vice-president of McGee stated that they are neither employees of Hallmark nor of McGee, but rather are employees of Hallmark Cards, Inc.[41] It is undisputed that many, if not all, of the directors and officers of McGee are employed as directors and officers of Hallmark. While this does not per se imply alter ego status,[42] it is again one factor to consider.

### c. Does Hallmark finance McGee?

McGee's director testified that Hallmark provided the funds needed to produce Sarah III and were merely a journal entry on the books at Hallmark and not an actual cash transaction.[43] McGee's sole purpose is to produce movies for Hallmark. Further, uncontroverted testimony states that the general overhead expenses of McGee are paid by Hallmark.

---

33. *Dean Operations v. One Seventy Associates,* 257 Kan. 676, 896 P.2d 1012, 1017 (1995).

34. *Id.* at 1018.

35. *Dean Operations,* 896 P.2d 1012.

36. *Doughty v. CSX Trans., Inc.,* 258 Kan. 493, 905 P.2d 106, 111 (1995).

37. Uncontroverted fact 64.

38. Defendant Hallmark's Reply, p. 18 (citing *Key v. Liquid Energy Corp.,* 906 F.2d 500, 504 (10th Cir.1990)).

39. Uncontroverted fact 50.

40. *Id.*

41. *Id.*

42. *Key v. Liquid Energy Corp.,* 906 F.2d at 504.

43. Uncontroverted fact 64.

### d. Did Hallmark subscribe to all of the stock in McGee or otherwise cause McGee to incorporate?

Testimony of McGee's vice-president was that McGee was incorporated, along with other production companies, to make films based on ideas generated and later distributed by Hallmark.

### e. Does McGee have grossly inadequate capital?

McGee's director testified that the funds needed to produce movies came from Hallmark.[44] Additionally, expenses of McGee such as insurance, legal services and risk management are paid by Hallmark. The salaries of McGee employees are paid by Hallmark Cards, Inc. There is an issue of fact regarding the actual assets of McGee.

### f. Does Hallmark pay the salaries, losses or expenses of McGee?

Testimony reveals that the salaries of McGee employees are paid by Hallmark Cards, Inc., not by Hallmark Hall of Fame Productions. While this may technically avoid a showing of this factor, this fact does go to the capitalization of McGee.

Hallmark pays McGee's legal services, insurance services and risk management services.[45] In fact, McGee's insurance policy does not even bear its name. Rather it is in the name of another affiliate of Hallmark Cards, Inc.[46]

### g. Does McGee have any assets not conveyed by Hallmark and not have any substantial business except for that with Hallmark?

The extent of McGee's assets independent of Hallmark is unclear. It appears

that the witnesses objected to the 30(b)(6) notice and did not provide testimony regarding the assets of McGee. McGee was formed specifically to produce Hallmark movies, specifically Sarah III (and possibly the earlier Sarah productions).

### h. Does Hallmark refer to McGee as a division or department?

The contract to produce Sarah III described McGee as an "affiliate of Hallmark."[47] Hallmark repeatedly refers to McGee as a subsidiary, which merely confirms that Hallmark owns all the stock of McGee. Using the term subsidiary does not give any weight to this factor.

### i. Do the directors or executives of McGee act independently, in the interest of McGee, but take direction from Hallmark?

Hallmark concedes that the directors of McGee take direction from Hallmark in decision making because Hallmark is the sole shareholder of McGee.[48]

### j. Are the formal legal requirements observed to make McGee a separate legal entity?

Hallmark and McGee both use the same address in Studio City, California.[49] The vice-president of McGee testified that she makes decisions based on input from Hallmark, as its sole stockholder, and by unanimous consent of the directors of McGee.[50]

It appears that plaintiff can provide some evidence of nearly every factor of the alter ego test. In rebuttal, Hallmark merely offers that each element does not

44. Uncontroverted fact 64.

45. Uncontroverted fact 69.

46. Uncontroverted fact 70.

47. Uncontroverted fact 49.

48. Uncontroverted fact 54.

49. Uncontroverted fact 72.

50. Controverted and Uncontroverted fact 54.

in itself create the alter ego status. While correct, the fact that nearly all of the factors are present in this case does nothing to establish the two corporations as separate legal entities. Rather, it makes it apparent that there is a question of fact as to whether Hallmark was so dominating and controlling in the actions of McGee that they were actually one and the same.

In addition to the facts listed above, the parties' pleadings also reveal that a vice-president at McGee was an employee of Hallmark Cards, Inc. and was also the executive producer on Sarah III, the very activity in question in this case.[51] Further, that same vice-president signed contracts dealing with the production of Sarah III on behalf of both Hallmark and McGee.[52] Other strong evidence of Hallmark's interactions in the day to day activities of McGee's film productions is that Hallmark forwarded its safety policies, as adapted for the *specific* shooting of Sarah III, to McGee for use in the production of the movie, indicating that they are to be returned at "wrap."[53] It is blatantly apparent that a question of fact exists about the status of Hallmark and McGee.

### k. Plaintiff's Injustice

A second hurdle for plaintiff in proving alter ego status is injustice. Plaintiff must show that allowing the entities to operate as distinct and separate is an injustice to him specifically.[54] While plaintiff has set out nothing to suggest that Hallmark and McGee held themselves out as one entity to him or the public in general, plaintiff's evidence does suggest questionable capitalization of McGee. All funding for the production of Sarah III came from Hallmark. McGee did not pay the salaries of its employees. And Hallmark paid the overhead expenses of McGee. Additionally, the insurance policy which McGee alleges does not even bear the name of McGee. Considering the prayers for relief, both compensatory and punitive, plaintiff has demonstrated that injustice is a question of fact.

Hallmark cites this district's decision in *HealthOne, Inc. v. Columbia*[55] to support its position that injustice is not present. In *HealthOne*, the court found that piercing the corporate veil was not warranted because no injustice was shown when the plaintiff contracted with the defendant and nothing in the contract suggested that Columbia/HCA was a party to the contract between the plaintiff and Wesley Medical Center. Further, the plaintiff failed to show how injustice would occur if they were only allowed to recover against Wesley and not the parent company, Columbia/HCA. But the facts before this Court are distinguishable. Plaintiff did not enter an express contract with McGee or Hallmark. A decision that no injustice exists is easier to find in cases with express contracts where the plaintiff relies on the company named in the contract.[56] Further, because of the question of fact about the assets of McGee, summary judgment cannot be granted.

### 2. Joint Venture

 Hallmark also argues that it was not in a joint venture with McGee in the production of Sarah III. Many of the same facts which implicate alter ego status apply to a joint venture analysis. A joint venture exists where two or more corporations associate to effectuate a for profit

---

**51.** Uncontroverted fact 56.

**52.** Uncontroverted fact 59.

**53.** Uncontroverted fact 62.

**54.** *Dean Operations*, 896 P.2d 1012.

**55.** 93 F.Supp.2d 1152 (D.Kan.2000).

**56.** *Huard v. Shreveport Pirates, Inc.*, 147 F.3d 406, 409 (5th Cir.1998).

"single business enterprise." [57] There must be an agreement between the parties to create a joint venture; however, that agreement can be inferred from the parties' conduct.[58] Like an alter ego determination, courts determine whether a joint venture exists by looking at five, non-dispositive factors.

> (1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement.[59]

The facts set out above in the discussion of alter ego are applicable to this discussion as well. Hallmark pays many of the expenses of McGee to include legal services, insurance and risk management. Further, Hallmark provides the funding for McGee's sole function—producing movies. Directors and officers of Hallmark also function as directors and officers of McGee. McGee's vice-president testified that she consulted with Hallmark in making decisions about McGee's operations. Further, Hallmark imposed its policies, as adapted for the Sarah III project, on McGee's activities. The parties' intentions is evidenced by controverted facts, and thus is a question for the jury. Hallmark created McGee to produce movies that it generated ideas for; however, it would appear that some factual assertions imply that Hallmark participated in much of the decisions, policy making and profit sharing in McGee. Given the controverted material questions of fact, the Court must deny the motion for summary judgment.

### 3. Hallmark's Control of the Movie Set

One of Plaintiff's theories of recovery is that Hallmark is liable because it had control over the movie set and was thus in the position of a landowner. Hallmark denies that it was a landowner and that it had any duty by which liability could be imposed. Hallmark is correct that plaintiff must prove Hallmark was a landowner, occupier and possessor to meet the elements of a negligence claim. However, a material question of fact remains as to whether McGee is the alter ego of Hallmark or whether McGee and Hallmark were involved in a joint venture. If a trier of fact finds either of these present, then Hallmark will stand in the same shoes of McGee, as one entity and landowner status will be imputed to them. Summary judgment is not appropriate without a trier of fact answering the alter ego and joint venture questions.

### IV. CONCLUSION

Because questions of fact remain as to the status of McGee as a special employer, whether McGee is the alter ego of Hallmark, whether Hallmark and McGee were involved in a joint venture and the duty and breach of landowner duties of McGee and potentially Hallmark, summary judgment as to both defendants (Docs. 116 and 117) is denied.

Plaintiff in this case filed a Surreply or in the alternative a motion to strike new issue of defendants (Doc. 142). Defendants, in response, filed motions to strike plaintiff's surreply, or in the alternative, responses to the Surreply (Docs. 143 and 145). Plaintiffs surreply was allowed and considered in this decision and plaintiff's

---

57. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 596 P.2d 816, 822 (1979).

58. *Id.* at 822.

59. *Id* at 823.

motion to strike is denied as a new issue was not raised by defendants, rather the briefing in the reply was merely more thorough than previously submitted. Defendants' motions to strike plaintiff's surreply are denied and both defendants' responses were considered by the court in this decision.